180258.1

Milton Springut, Esq. (MS6571)
Tal S. Benschar, Esq. (TSB0838)
KALOW & SPRINGUT LLP
488 Madison Avenue
New York, New York 10022
Tel: (212) 813-1600
Fax: (212) 813-9600

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

VAN CLEEF & ARPELS LOGISTICS, S.A. and    :
VAN CLEEF & ARPELS, INC,                           :            Civil Action
                                                                    :
                              Plaintiffs,                   :            No. 08-7073
                                                                    :
                      v.                                          :
                                                                    :
JERI COHEN JEWELRY, INC.;                        :
and JOHN DOES 1-10,                                   :
                                                                    :
                              Defendants.                :
---------------------------------------------------------------x

## DECLARATION OF TAL S. BENSCHAR

**TAL S. BENSCHAR** declares that:

1.    I am a partner of Kalow & Springut LLP, counsel for Plaintiffs in the above

action.  I make this declaration in support of Plaintiffs' motions for a preliminary injunction and

for expedited discovery.

## Documents From Prior Cases

2.    Plaintiffs' motions rely in part on motion papers and a decision thereon in a prior

action, *Van Cleef & Arpels Logistics, S.A. v. Landau Jewelry,* Civil Action No. 07-564 (SAS),

(hereinafter the "*Landau* Action") and a declaration submitted in another prior action, *Van Cleef*

*& Arpels Logistics, S.A. v. Viccario Fine Jewelry,* Civil Action No. 08-5169 (SAS) (the

"*Viccario* Action.")  Specifically, Plaintiffs rely upon the following documents attached as the

following Benschar Declaration Exhibits:

| Title Of Prior Document From *Landau* Action | Benschar Decl. Exh. |
| --- | --- |
| Declaration of Frederick Gilbert Zinck | A |
| Declaration and Expert Report of Professor Nicolas Binctin | B |
| Excerpts of Deposition Transcript of Michelin Roussier | C |
| Opinion and Order 4/21/08 | D |
| **Title Of Prior Document From *Viccario* Action** | **Benschar Decl. Exh.** |
| Declaration of Nicholas Luchsinger | E |

**Plaintiffs' Correspondence With Defendants**

3.      On July 7, 2008, our office, acting on behalf of VCA, wrote a cease and desist

letter to Defendant Jeri Cohen Jewelry, Inc. seeking to have it cease its sales of infringing items

and ascertain the source and extent of its infringement.  In the next three weeks, the parties

exchanged correspondence several times.  By July 30th it was clear that the parties were unable to

reach an agreement that would provide VCA with both a cessation of infringement and the

information it needs to stop further infringements by Defendant's source.

**Plaintiffs' Need For Immediate Relief**

4.      For the reasons set forth herein and in the memorandum of law in support of

Plaintiffs' motions, Plaintiffs are experiencing continuing and irreparable harm from the sale and

offering for sale of jewelry items which copy Plaintiffs' copyrighted jewelry design.  Based upon the foregoing, it is respectfully submitted that there are good and sufficient reasons for the Court to proceed expeditiously by Order to Show Cause for an order for a preliminary injunction and for expedited discovery.

5.    No previous request has been made for the relief sought herein.

6.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 12, 2008
New York, New York

By: _____
                    Tal Benschar

3

**Exhibit A**

164388.1

Milton Springut (MS6571)
Tal S. Benschar (TSB0838)
KALOW & SPRINGUT LLP
488 Madison Avenue
New York, New York 10022
(212) 813-1600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

VAN CLEEF & ARPELS LOGISTICS, S.A., *et al.*,:      Consolidated Civil Actions

                     Plaintiffs,       :      No. 07-CV-564 (SAS)

v.                         :

                             :

LANDAU JEWELRY, *et al.*,        :

                             :

              Defendant.     :

-------------------------------------------------------------x

VAN CLEEF & ARPELS LOGISTICS, S.A., *et al.*, :

                             :

                 Plaintiff,      :

v.                         :

                             :

ZIRCONMANIA, INC., *et al.*,      :

                             :

             Defendants.    :

-------------------------------------------------------------x

VAN CLEEF & ARPELS LOGISTICS, S.A.; *et al.*,:

                             :

                 Plaintiffs,     :

v.                         :

                             :

JJ GOLD INTERNATIONAL, INC. d/b/a   :
LAUREN G. ADAMS, *et al.*,      :

                             :

             Defendants.    :

-------------------------------------------------------------x

## **DECLARATION OF FREDERIC GILBERT-ZINCK**

**FREDERIC GILBERT-ZINCK** declares that:

1.    I am the General Secretary of Van Cleef & Arpels International, S.A.S., a French corporation based in Paris, France.

2.    I make this declaration to set forth several facts, which I understand may be pertinent to this case.  In particular, I set forth below the corporate structure of several Van Cleef & Arpels ("VCA") companies.

3.    It should be noted that originally "Van Cleef & Arpels" was several companies, all owned by the Arpels family. This was the case through the year 1999, when Van Cleef & Arpels was acquired by the Richemont Group and underwent significant reorganization.

**Corporate Structure Prior To 1999-2000**

4.    Prior to 2000, the chief Van Cleef & Arpels company was Van Cleef & Arpels, S.A., a company based in Paris, France.  The company was headed by the brothers Jacques Arpels and Pierre Arpels.

5.    Another company, a separate wholly-owned subsidiary named SLEPRA (Arpels backwards) or Société de Lapidaires et Professionnels de la Recherche Artistique, functioned as the VCA design house, creating new models which would then be marketed by Van Cleef & Arpels, S.A. through its stores and boutiques.

6.    During the same period of time, there was a separate VCA company, located in New York, Van Cleef & Arpels, Inc.  The company had no formal corporate relationship with Van Cleef & Arpels, S.A., but was headed by another Arpels brother, Claude Arpels.  Van Cleef & Arpels, Inc. operated a boutique on Fifth Avenue in New York where it manufactured jewelry

and also imported other jewelry from Van Cleef & Arpels, S.A. (France) for distribution in the United States.

**The Reorganization Under Richemont**

7.    After the Richemont acquisition in 1999, the companies were reorganized. SLEPRA was merged into Van Cleef & Arpels, S.A. (France). On a later date, Van Cleef & Arpels Holding France (at the time named Florence International S.A.) took over all assets of Van Cleef & Arpels, S.A. Van Cleef & Arpels Holding France remains an active company today. However, all of its intellectual property assets were then transferred to Van Cleef & Arpels Logistics, S.A., a Swiss company, whose name was recently changed to Van Cleef & Arpels S.A. (Switzerland).

8.    All of the above VCA companies are currently part of the Richemont Group.

**Assignment And Transfer Of Rights In The Alhambra Design**

9.    It is my understanding, based on review of the Statement and discussions with Madame Micheline Roussier, that what is today known as the Vintage Alhambra design was created by SLEPRA in 1968 and that jewelry bearing such design was sold in France and the United States.

10.    At that time it was the general practice that all U.S. rights, including copyrights in designs created by SLEPRA, were assigned to Van Cleef & Arpels, Inc. in New York, so that the American company would be able to enforce VCA's rights in the United States.

11.    I know this because at a later reorganization, we identified numerous copyright registrations in the name of Van Cleef & Arpels, Inc., which we later transferred to Van Cleef &

3

Arpels Logistics, S.A., although not the Vintage Alhambra registration. This course of conduct, of transferring U.S. rights in designs created by SLEPRA to the U.S. company was done orally; no writings to this effect were even undertaken, apart from the copyright applications filed in the name of Van Cleef & Arpels, Inc.

12.      To confirm the Assignment from SLEPRA to Van Cleef & Arpels, Inc., on or about November 5, 2007, the President of Van Cleef & Arpels Holding France, Stanislas de Quercize, signed an Assignment and Deed of Confirmation. A copy of same is attached hereto as Gilbert-Zinck Declaration Exhibit A. Such assignment includes all rights related to the Vintage Alhambra copyright, including any renewals, extensions and restorations thereof.

13.      The French copyright in the Vintage Alhambra remains in force today. In fact, our company is currently enforcing that copyright in cases pending in French courts.

14.      I declare under penalty of perjury under the laws of the United States that the forgoing is true and correct pursuant to 28 U.S.C. § 1746.

Dated: December 2? , 2007            By: _____
Paris, France                                  Frederic Gilbert-Zinck

4

**DECLARATION OF FREDERIC GILBERT-ZINCK**

**EXHIBIT A**

## ASSIGNMENT AND DEED OF CONFIRMATION

WHEREAS, Van Cleef & Arpels Holding France, a company organized under the laws of France, with offices at 22, Place Vendôme, Paris, France is a successor in interest to Van Cleef & Arpels SA and which in turn is a successor in interest to SLEPRA (Société de Lapidaires et Professionnels de la Recherche Artistique), referred to herein as the Assignor, was, in or about 1968, the author and owner of all of the right, title and interest for the entire world in and to the work identified and listed in Exhibit A hereto ("the Work") and the copyright therein, and

WHEREAS, in or about 1968, Assignor transferred and assigned all of the right, title and interest for the United States in and to the Work and the copyright therein for and during the existence of the copyright, and all renewals and extensions thereof that may be secured under the laws or hereafter in effect in the United States, together with all causes of action for infringement and the right to sue therefore unto Van Cleef & Arpels, Inc., a company organized under the laws of the State of New York with offices at 12 West 57th Street, New York, NY 10015, referred to herein as the Assignee, and

THEREFORE, in consideration of and in exchange for the sum of $1.00 (One Dollar) and other good and valuable consideration, receipt of which is hereby acknowledged, said Assignor, does hereby confirm the aforesaid transfer and assignment, setting over unto said Assignee, all of the right, title and interest for the United States in and to the Work and the copyright therein for and during the existence of the copyright, and all renewals, extensions and restorations thereof that may be secured under the laws or hereafter in effect in the United States, together with all causes of action for infringement and the right to sue therefore, and

Assignor hereby constitutes and appoints Assignee its true and lawful attorney-in-fact, with full power of substitution, in Assignor's name and stead, to take all steps necessary to enforce any claim or right to take renewals in and to the Work and the copyright therein.

This document shall be governed by the laws of the State of New York of the United States without regard to choice-of-law principles.

IN WITNESS WHEREOF, the Assignor has caused this Assignment and Deed of Confirmation to be signed in its name as of this 5th day of November 2007.

VAN CLEEF & ARPELS HOLDING FRANCE

By: _____

Stanislas de QUERCIZE - President

<u>Exhibit A</u>

| <u>Work</u> | <u>Copyright Registration</u> |
|---|---|
| "Alhambra" Necklace #4V258 – Gold & Semi-precious Stones | GP 101958 |

**Exhibit B**

159543.1

Milton Springut (MS6571)
Tal S. Benshar (TSB0838)
KALOW & SPRINGUT LLP
488 Madison Avenue
New York, New York 10022
(212) 813-1600

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
VAN CLEEF & ARPELS LOGISTICS, S.A., *et al.,* :          Consolidated Civil Actions
                                              :
              Plaintiffs,                     :          No. 07-CV-564 (SAS)
                                              :
v.                                            :
                                              :
LANDAU JEWELRY, *et al.,*                     :
                                              :
              Defendant.                      :
------------------------------------------------------------x
VAN CLEEF & ARPELS LOGISTICS, S.A., *et al.*: :
                                              :
              Plaintiff,                      :
                                              :
v.                                            :
                                              :
ZIRCONMANIA, INC., *et al.,*                  :
                                              :
              Defendants.                     :
------------------------------------------------------------x
VAN CLEEF & ARPELS LOGISTICS, S.A.; *et al.*: :
                                              :
              Plaintiffs,                     :
                                              :
v.                                            :
                                              :
JJ GOLD INTERNATIONAL, INC. d/b/a             :
LAUREN G. ADAMS, *et al.,*                    :
                                              :
              Defendants.                     :
------------------------------------------------------------x

### DECLARATION AND EXPERT REPORT
### OF PROFESSOR NICOLAS BINCTIN

NICOLAS BINCTIN declares that:

1.      I am a Professor at the University of Poitiers, specializing in Intellectual

Property Law and especially in Copyright Law, and have been requested to provide expert

testimony with respect to the protection under French Copyright Law of the "Vintage Alhambra", created in 1968, which I understand is at issue in this case.

2.    Attached as Exhibit A is a copy of my *curriculum vitae* that sets forth my education, experience, qualifications and the publications I have authored in the last ten years.

3.    Attached as Exhibit B is a copy of my substantive report.

4.    In the previous four years, I have never testified as an expert at trial nor by deposition.

5.    The compensation to be paid to me for this work is Euro 300 per hour.

6.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 15, 2007
Paris, France

By: _____
          Nicolas Binctin

2

**BINCTIN EXPERT REPORT**

**EXHIBIT A**

**(ENGLISH)**

**Nicolas Binctin**
Assistant law professor
Université de Poitiers

19 Avenue du Général Leclerc, 75014 Paris
Date of birth: April 15, 1976.
Telephone: 01.43.22.21.49 / 06.64.92.51.87
Nicolas.binctin@univ-poitiers.fr

*Curriculum vitae*

Degrees

| | |
|---|---|
| 2007 | Adjunct professor in private law and criminology. |
| 2005 | - Juris Doctor, thesis entitled *Le capital intellectuel* [Intellectual Capital] defended at the Université Paris II, under the supervision of G. Bonet, thesis advisor, before a panel consisting of M. Germain, H. Synvet, C. Caron and P. Didier, obtained with honors. Awarded 2005 best thesis prize, Université Paris II Panthéon Assas.<br>- Passed Paris Bar exam. |
| 1999 | Graduate degree in literary and artistic property law and patents and trademarks under the supervision of Professor Gautier, Université Paris II |

Teaching activities

| | |
|---|---|
| Since 2007 | Law Professor, *Law school of the Université de Poitiers*.<br>CECOJI member [research center for international legal cooperation].<br>Copyright and Intellectual Property management seminar at the Université de Paris I Panthéon-Sorbonne. |
| *Adjunct professor* | |
| Since 2005 | - *Université Paris XII*, Master Pro II – Applied intellectual property law, Intellectual Property tax and accounting law.<br>- *Université d'Evry*, Master I – Business Law, Intellectual Property Law.<br>- *Université d'Evry*, Master Pro II – Contracts and guarantees, Intellectual Property Contracts. |
| Since 2003 | - *Ecole Nationale Supérieure des Télécommunications,* Intellectual Property Law.<br>- *Reims Management School*, Intellectual Property Law and Management, SUP de CO business law curriculum, TEMA, MASTER. |
| *Teaching assistant* | |
| 2003-2004 | - *Université Paris II,* Business Law MA – Distressed company law and payment methods and credit law, Teaching assistant for Professor Germain.<br>- *Université Paris IX Dauphine*, 2nd year, Law of obligations, under the supervision of Ms. Lavagne. |
| 2001-2003 | Teaching assistant, *Université Paris IX Dauphine*, 2nd year, Law of obligations, under the supervision of Ms. Lavagne. |
| 2000-2001 | *Université Paris II,* Bachelor of Law – Corporate law, Teaching assistant for Professor Germain. |

Languages

| | |
|---|---|
| English | Conversant in English. Capability to draft and negotiate contracts in English. |
| German | Solid knowledge. Student at the French high school in Bonn. |
| Polish | Lived for three years in Cracow. |

**Research and publications**

<u>Published articles and research</u>:

| | |
|---|---|
| 2007 | - Le capital intellectuel – De l'apport en société de biens intellectuels [Intellectual capital: Contribution of intellectual property to companies], *Litec* 2007, *Bibliothèque de droit de l'entreprise* collection. |
| | - Comment on the January 31, 2007 decision of the Court of Cassation, Civil Chamber, étude sur le droit moral et le domaine public [study on moral right and public domain], *Les Petites Affiches*, July 19, 2007, issue no. 144, p. 8. |
| | - L'évaluation des actifs immatériels peut-elle servir pour évaluer le préjudice ? [Can valuing intangible assets be used as the basis for setting damages?] *Cahiers de droit de l'entreprise*, July-August 2007 issue no. 4, p. 31. |
| 2006 | - Le cumul d'appropriation : du parfum au logiciel, [Aggregating appropriation: from perfume to software] *Communication Commerce Electronique,* December 2006, Etudes 36 p. 9. |
| | - La légalité procédurale en droit des sociétés – A propos de la révocation, [Procedural legality in law of corporations – On being removed from office] *Les Petites Affiches*, September 12, 2006, issue no. 182, p. 3. |
| | - Les biens intellectuels - Contribution à l'étude des choses, [Intellectual assets : contribution to the study of things] *Communication Commerce Electronique,* June 2006, Etudes 14 p. 8. |
| 2005 | - Memorandum on the September 14, 2005 decision of the Court of Cassation, Civil Chamber, *JCP E* 2005, issue no. 1867, p. 2218, étude sur la bonne foi dans les contrats [study on good faith in contracts]. |
| | - Le capital intellectuel [Intellectual Capital], *Communication Commerce Electronique,* July 2005, Etudes 32, p. 19. |
| 2004 | - Comment valoriser vos actifs incorporels dans le référentiel IFRS [How to value intangibles using IFRS] *Option Finance* issue no. 806, November 2, 2004, p. 44, written with J-S Lantz. |
| | - L'application de l'article L. 214-1 du CPI aux diffusions télévisuelles [The application of Article L. 214-1 of the French Intellectual Property Code to television broadcasts], *Légipresse* issue no. 209, March 2004, p. 23. |

<u>Conferences</u>:

| | |
|---|---|
| 2007 | - L'évaluation des actifs immatériels peut-elle servir pour évaluer le préjudice ? [Can valuing intangible assets be used as the basis for setting damages?], *L'évaluation du préjudice de la contrefaçon*, [Setting damages for infringement] Assemblée Nationale, Palais Bourbon, Paris, June 4. |
| | - Co-managed and organized the colloquium, *La construction du droit d'auteur : entre autarcie et dialogue* [The construction of copyright law: between autarky and dialog], Université de Montpellier, May 10 and 11. |

- Intellectual property and valuation, *Perspectives tunisiennes de la Propriété industrielle*, [Tunisian Overview of Intellectual Property] Seminar for businesses and entrepreneurs, Tunis, Tunisia, April 28.
- Copyright and Academic Research, Université de Provence, March 30.

2006
- Les prévisions fiscales dans les contrats de la propriété intellectuelle, [Tax projections in intellectual property contracts] *La pratique contractuelle en droit de la propriété intellectuelle*, [Contractual practice in intellectual property law] Assemblée Nationale, Palais Bourbon, Paris, June 16.
- Apport partiel d'actifs : dimensions juridique et économique d'une opération d'apport en nature de PI [Partial asset contribution: legal and economic aspects of a contribution in kind of Intellectual Property] *Les entretiens de Paris HEC-INPI*, Paris, May 18 and 19.

2005
- Copyright and theater, Academy of Dramatic Arts, Shanghai, China, May 26.

2004
- The regionalization of Intellectual Property, IEP, Paris, March 2.

2003
- Vers un nouveau statut pour les créations de salariés ? [Working towards a new status for employee inventions], EuroForum, Paris, March 11.

2002
- Cycle of 4 conferences/seminars on government-sponsored scientific research and intellectual property, INSERM, Lille.

2001
- Cycle of 7 conferences of introduction to intellectual property, Groupement des écoles de télécommunication, ENST Brest, ENST Paris, INT.
- Legal aspect of Open Source Software, conference for the research laboratories of the European Commission, Ispra, Italy, May.

**BINCTIN EXPERT REPORT**

**EXHIBIT B**

**(ENGLISH)**

Paris, October 12, 2007

The undersigned, Nicolas Binctin, Professor of law at the University of Poitiers, lecturing in copyright at the universities of Poitiers and Paris I Panthéon-Sorbonne, hereby explains the following.

Van Cleef & Arpels has requested me to provide it with a legal opinion, in French law, on the following matters:

1.   Is the model Van Cleef & Arpels jewelry commonly known as *Vintage Alhambra* copyright protectable?
2.   In the affirmative, who originally holds the rights to that model?

My opinion has been requested in view of production in the context of various lawsuits being held in the United States concerning the infringement of that model.

Mr. Frédéric Gilbert-Zinck, representative of Van Cleef & Arpels, has provided me with a photograph of the relevant model (appended hereto as Schedule …), as well as an affidavit by Mrs. Micheline Roussier dated October 1, 2007 describing the conditions and context of the creation of that model (appended as Schedule …).

After having duly reviewed those documents, my opinion is the following.

### 1.   *The relevant jewelry model is protected by copyright*

There is no doubt, to my mind, that the model presented to me is protected by copyright.

### a)   Generalities

French copyright legislation is governed by a certain number of guiding principles, one of them being posited by article L.112-1 of the French Intellectual Property Code (IPC), which provides that: *"the provisions of this code shall protect the rights of authors in all creative works, whatever their kind, form of expression, merit or purpose."*

In practice, this means that the court may not refer to a category of works (artistic, literary or musical) in granting protection, any more than to the form in which the work is expressed or the merit of the creation since in our legal system the latest literary prize such as the French *Goncourt* literary award is protected in the same manner as a salad bowl.[1]  Under such conditions, nothing prevents, in fact the opposite is true, contemplating the copyright protection of a piece of jewelry.  In addition, the purpose of a creation (for instance industrial, commercial or purely artistic) has no bearing on copyright protection.   Copyright can thus perfectly apply to a jewelry model distributed in the stream of commerce, such as the one presented to me in the

---

[1] Crim, May 2, 1961, JCP 1961 II 12242; Crim, October 3, 1963, Bull. Crim no. 300.

context of this legal opinion.

**There is no doubt that the *Vintage Alhambra* model presents a purely ornamental and aesthetic nature.  As a result, copyright protection clearly imposes itself.**

**b)    Analysis of the *Vintage Alhambra* necklace**

**To be protected by copyright,** the jewelry examined must correspond to a creation expressed in an original form.

The **form** of the *Vintage Alhambra* goes beyond a simple idea, consisting in taking inspiration from the shape of a flower (or of a cloverleaf) to create a jewelry piece.

The form generally relies on two elements: the choice and layout of the materials.  Is there any choice and specific layout involved in the creation of the *Vintage Alhambra*?  Clearly.  The creator chose certain materials: stones for example, which he then arranged in a certain manner (for example a bordered mother-of-pearl inlay as well as the cloverleaf shape of the jewelry).  More specifically, the form of the model presented to me relied on the combination of the following elements:

1    The specific shape, calling to mind a four-leafed clover;
2    A gold border with a pearled metal motif;
3    Contrasting with the inside comprised of smooth stone or granulated metal.

More specifically, the "uniqueness", pursuant to Mrs Roussier's affidavit, and originality of the Alhambra motif finds its formal expression in each of the following elements and their combination:

(i)    four semi-circular and perfectly symmetrical lobes, joined together to form a stylised overall shape inspired by that of a four-leafed clover;

(ii)   the border of which is slightly elevated, thus serving to highlight the pure lines of the contour of the symmetrical quadrilobed shape;

(iii)  such border being additionally emphasized by means of a pearled metal motif, which contrasts with the smooth (when composed of a stone) or granulated (when made up of metal) centre of the jewel;

(iv)   the contrast between border and centre is further stressed by the difference in colour between the neutral metal edges and the coloured centre, when in presence of a coral or lapis stone.

The originality of the Alhambra necklace is further characterised by a repetition of the Alhambra motif as described above spaced out on regular intervals.

The shape given to the work is perfectly described in Mrs. Roussier's affidavit.

*"Among the prototypes proposed by Richards & Wildenstein workshop I finally **chose** a very exclusive look: mother-of-pearl inlay, metal droplets and **use** of hard stones such as coral, lapis and onyx, which were very much in fashion in the 1970s."*

The criteria of choice and of the layout of the materials is thus met.

The form given must be **original**, meaning that the creator must use a minimum of imagination, by escaping technical constraints.  In the present instance, it is clear that the creator was not guided by technical constraints.  Indeed, why choose on the one hand the cloverleaf motif rather than another one, and on the other, why this exclusive way of expressing its form?  Why surround the flower by a pearled motif?  No technical constraint imposed any specific shape on the designer of the jewelry piece studied.

In this respect, Mrs. Roussier's affidavit indicates that the artistic choices having presided over the creation of the *Vintage Alhambra* are intimately connected to the aesthetic world of Van Cleef & Arpels: *"The clover luck charm and, more generally, the botanical world, has always been a symbol at Van Cleef & Arpels.  Several clover motif designs were made, and in particular the "cosmos" clip, which was directly inspired from clover-shaped Van Cleef & Arpels jewelry created in the 1930s."*

**c)    Case law examples**

Lastly, it should be added that the principle of copyright protection of jewelry does not raise any difficulties.  I have carried out a case law search for the years 2005 and 2006, focusing solely on decisions issuing from the Court of Appeal of Paris (4th division, sections A and B) and have come up with a dozen decisions along these lines.

Without any attempt at exhaustiveness, I can cite:

CA Paris 4th division, section A 20, decision of April 2005:

*"Whereas it follows that the Taxi bracelet Taxi created by AG, the commonplace nature of which has not been established, is by the specific arrangement of its glass and silver pearls and its tassel, the result of a creative process that displays the imprint of the personality of its author, and so benefits from the protection introduced by book I of the Intellectual Property Code".*

CA Paris 4th division, section B 21, decision of October 2005:

*"But whereas UBU does not claim any genre to which all of the ethnic jewelry would correspond but a piece of jewelry as designed in respect of which the lower court accepted, for pertinent reasons accepted by this court, the originality without any earlier right having been validly asserted against it".*

CA Paris 4th division, section B 16, decision of June 2006:

*"The court ascertains in view of the photographs […] that it is formed by the association, per se original, of a hardware item, namely a knob, and of decorative elements spaced out along its outer sides, according to a layout that is undeniably imaginative, such that the whole thus obtained reflects the personality of its author and displays originality".*

Along the same lines, reference can be made to the following decisions:

CA Paris 4th division, section A, February 15, 2006, September 27, 2006, October 25, 2006, November 8, 2006

CA Paris 4th division, section B 1 and February 2006, September 29, 2006, October 27, 2006

**In conclusion:**
**Jewelry is effectively protectable under French copyright law.**
**In this framework and in view of the elements on the basis of which this opinion is issued (photograph of the *Vintage Alhambra*) the jewelry model is indeed protected by copyright.**

But who holds the rights?

### 2. <u>On the ownership of the rights</u>

Based on Mrs. Roussier's affidavit, it is clear to me that the disputed jewelry has the status of a collective work *("œuvre collective")*.

The definition of this concept, which is specific to French law, being a delicate matter, I will briefly outline its guiding principles (a) before applying them to the case at hand (b).

### a)    Overview of the principles governing collective works

Pursuant to article L.113-2 (2) of the IPC, *"Collective work shall mean a work created at the initiative of a natural or legal person who edits it, publishes it and discloses it under his name and in which the personal contributions of the various authors who participated in its production are merged in the overall work for which they were conceived, without it being possible to attribute to each author a separate right in the work as created".*

In accordance with case law, this qualification encompasses creations as varied as: a newspaper,[2] an encyclopedia,[3] a dictionary[4] as well as jewelry.[5]

---

[2]. Civ 1[ère], May 6, 1997, D. 1998 somm. 190 obs. Colombet.
[3]. Civ. 1[ère], July 1, 1990, D. 1970 769.
[4] Commercial Court of Paris, January 5, 1998, RIDA April 1998 474.
[5] CA Paris, November 19, 1991, "Cartier v Aurélien *et al.*" 90/014907 and 91/017090.

4

It is important to note the significance of the stakes involved by such characterization. Pursuant to article L. 113-5 IPC: "*A collective work shall be the property, unless proved otherwise, of the natural or legal person under whose name it has been disclosed. The author's rights shall vest in such person.*"

**The copyright here is directly created to the benefit of the entrepreneur without any assignment of intellectual property rights being required.** It should be stressed that in French law it is generally considered that only a natural person can be considered to be an author. This vesting of rights in a legal person in the context of a collective work takes place *ab initio,* from the very creation.

What are the constituent elements of a collective work?

Concerning the concept of constituent elements, it can be said that an active "project manager" is required and that none of the contributors is intended to have separate rights in the work as created.

A collective work implies a project that will be pursued through to completion by its promoter, who is the project manager of such work. The latter may be a natural or legal person, even if in fact, the project manager will almost always be a legal person.

This project manager must also assume the direction of the project, which implies a link of subordination and dependence.

Article L. 113-3 stresses that it is the entrepreneur at the initiative of the work that edits, publishes and discloses it.

The second characteristic feature of a collective work is the fact that none of the contributors is intended to have separate rights in the work as created. This necessarily implies several contributions. The wording of the law requires (and this has resulted in much controversy in legal theory) the merger of these contributions such that it is impossible *"to attribute to each"* of the contributors *"a separate right"*. Without entering into debates in legal theory concerning this abstruse wording, it can simply be said that a collective work is one in which none of the individual contributors may assert a right over the overall work. While a journalist who signs an article is effectively identified as having authored the article, he cannot claim being the author of the newspaper! Similarly, a person having been involved in the design of a piece of jewelry by proposing a rough drawing of a jewelry design that will be modified as a result of back-and-forth exchanges between the members of a team composed of several designers, marketing staff, model makers, prototype makers etc., directed by a project manager, cannot claim ownership of the final piece of jewelry resulting from the efforts of all involved.

**b)    Application to the case at hand**

In view of Mrs. Roussier's affidavit describing the background in which it was created, the various criteria for characterization of a collective work outlined above are met with respect to the *Vintage Alhambra* model.

Power of initiative and direction of Van Cleef & Arpels

Mrs. Roussier states that, *"at the time"* (i.e., in 1968) *"general management wanted to offer affordable modern designs in the jewelry line we called "Boutique", in addition to the far more costly High-Fashion Jewelry"*, and that is was to meet this need that "Alhambra" was designed, at the initiative of Van Cleef & Arpels management.

We are accordingly in the presence of a promoter, a project manager: Slepra company of Van Cleef & Arpels group.

With Mrs. Roussier we are in the presence of a representative (employed between 1955 and 1993).

The legal person (Slepra), acting through its representative (Mrs. Roussier), ensured a veritable management role.  The creative process described in Mrs. Roussier's affidavit effectively illustrates a vertical, hierarchical management power, extending down from management to the artistic department, then to the outside workshops, with aesthetic decisions being ultimately made by Mrs. Roussier as the Head Designer, *"in close liaison with the company's general management"*.

Plurality of contributions

Mrs. Roussier also states that within Slepra, which has since been taken over by Van Cleef & Arpels group, she managed a team of creators (she cites two persons by name, indicating that there were others).  She adds that she also had recourse to outside service providers in creating jewelry.  Teamwork was thus the rule in that company when designing models.

Regarding the *Vintage Alhambra* more particularly, Mrs. Roussier states that the outside service provider *"Mr. Wildenstein actively participated, in liaison with VCA's general management and me, in the creation of Alhambra.  Its final look was effectively the result of many back-and-forth exchanges between my staff and Richards & Wildenstein workshop"*, before she chose the model that would ultimately be marketed.

The plurality of the contributions made is thus evident: beside Mrs. Roussier, the persons reporting to her, the management of Van Cleef & Arpels and Richards & Wildenstein workshop were involved in the design of the *Vintage Alhambra*.

None of these participants: members of Mrs. Roussier's team, or the workshops involved in the creation of the jewelry are in a position to assert any right whatsoever (no such claim ever having been formulated).

<u>Disclosure by Van Cleef & Arpels under the "Van Cleef & Arpels" brand name</u>

Mrs. Roussier indicates lastly that *"Alhambra was first launched in the United States"*, without it being necessary to specify that this launch took place at the initiative and upon the instructions of her then employer: Slepra company, which has now been taken over by Van Cleef & Arpels, under the "Van Cleef & Arpels" brand name.

Mrs. Roussier states that Alhambra began to be sold in 1971 in the Van Cleef & Arpels boutique at place Vendôme in Paris, before being sold around the entire world.

The description by Mrs. Roussier of the conditions in which the *Vintage Alhambra* was created clearly supports its characterization as a collective work, within the meaning of article L.113-2 (2) IPC.

This characterization entails application of the rules set forth by article L.113-5 IPC, such that it must be concluded that the rights over the creation concerned were, from the very beginning, owned by the person having disclosed it, namely Slepra, which I have been informed was merged into Van Cleef & Arpels.

\*        \*

**Conclusion:**

**Based on the foregoing, my legal opinion in French law concerning the matters set forth above is that:**

**The "Alhambra Vintage" is protected by copyright;**

**The copyright to this model is initially owned by SLEPRA and now by Van Cleef & Arpels.**

SCHEDULE 1



SCHEDULE 2

I was employed by Slepra company (Van Cleef & Arpels Group – "VCA") between 1955 and 1993 as Head Designer – Creator.  In that capacity I supervised, in close liaison with the general management of the company, the entire creative process of VCA jewelry, and was responsible for a team of creators, all of whom were employed by Slepra.  Those team members included Françoise Rousseau and Alain Dirringer...In addition, my duties regularly led me to work with outside workshops and jewelry producers with unparalleled know-how.  From memory, I would cite Lenfant, Péry, Lasbleiz, Janca, Mathon and Richards & Wildenstein.  In the framework of specific projects and special orders, I would occasionally ask those service providers to contribute to the creation of jewelry on behalf of VCA and under its close control.

I am now retired.

During the course of my career, I notably worked with my team on cloverleaf-inspired motifs.  The clover good luck charm and, in a general way, the botanical world, has always been a symbol at VCA.  Several clover motif designs were made, and in particular the Cosmos clip, which was directly inspired from VCA jewelry with a clover form created in the 1930s.

In 1968, France underwent violent student riots and I remember that this was when we came up with – in the course of our work and in close collaboration with Richard & Wildenstein workshop – the clover motif that is now known under the name of Alhambra.

At the time, general management wanted to offer affordable modern designs in the jewelry line we called "Boutique", in addition to the far more costly High-Fashion Jewelry.

Mr. Wildenstein actively participated, in liaison with VCA's general management and myself, in the creation of Alhambra.  Its final look was effectively the result of many back-and-forth exchanges between my staff and Richards & Wildenstein workshop.  Among the prototypes proposed by Richards & Wildenstein workshop I finally chose a very exclusive look: border of a pearled motif, carried out in granular metal and use of hard stones such as coral, lapis, onyx, which were very much in fashion in the 1970s.

Alhambra was first launched in the United States where it met with virtually immediate success, customers loving to wear several necklaces together – it was a very "Van Cleef" style.  Based on this success, Pierre and Jacques Arpels, then in charge of VCA Paris, asked me to prepared, with the assistance of my team, a collection of necklaces for the French market.  As I recall, the first Alhambra pieces were sold in our boutique at Place Vendôme in 1971, and our resellers and branches then distributed it around the entire world.

To judge today by the many advertisements and press articles featuring the Alhambra, a piece of jewelry displaying a strong Van Cleef & Arpels stamp is timeless.  Alhambra hasn't aged a day in the last 40 years!

Lastly, I hereby confirm, for any useful purpose this may avail, that all of the rights attached to the creations made by me or which I contributed to making while I employed by VCA are naturally owned by VCA.

/S
Micheline Roussier
Executed in Paris, on October 1, 2007

**BINCTIN EXPERT REPORT**

**EXHIBIT A**

**(FRENCH)**

**Nicolas BINCTIN**
Professeur agrégé des facultés de droit
Université de Poitiers

19, avenue du Général Leclerc, 75014 Paris
Né le 15 Avril 1976.
Tél. : 01.43.22.21.49 / 06.64.92.51.87
Nicolas.binctin@univ-poitiers.fr

*Curriculum vitae*

Titres universitaires

2007          Agrégation de droit privé et sciences criminelles.

2005          - Docteur en droit, thèse intitulée *Le capital intellectuel*, soutenue à l'Université Paris II, sous la direction de G. Bonet, devant un jury composé de M. Germain, H. Synvet, C. Caron et P. Didier, mention très honorable, avec les félicitations du jury. Prix de thèse 2005 de l'Université Paris II Panthéon Assas.
              - CAPA, Lauréat du Barreau de Paris.

1999          D.E.A. Propriété littéraire, artistique et industrielle, sous la direction de M. le professeur Gautier, Université Paris II.


Activités pédagogiques

Depuis 2007   Professeur de droit, *Faculté de droit de l'Université de Poitiers.*
              Membre du CECOJI.
              Séminaire de droit d'auteur et gestion du patrimoine intellectuel à l'Université Paris I Panthéon-Sorbonne.

*Chargé d'enseignement*

Depuis 2005   - *Université Paris XII*, Master Pro II - Droit de la propriété intellectuelle appliquée, Droit fiscal et droit comptable de la propriété intellectuelle.
              - *Université d'Evry*, Master I - Juriste d'affaires, Droit de la propriété intellectuelle.
              - *Université d'Evry*, Master Pro II - Contrats et Garanties, Contrats de la propriété intellectuelle.

Depuis 2003   - *Ecole Nationale Supérieure des Télécommunications,* Droit de la propriété intellectuelle.
              - *Reims Management School*, Droit et gestion de la propriété intellectuelle, cursus SUP de CO, TEMA, MASTER.

*Chargé de travaux dirigés*

2003-2004     - *Université Paris II,* Maîtrise de droit des affaires - Droit des entreprises en difficulté et droit des moyens de paiement et de crédit, Cours de M. le professeur Germain.
              - *Université Paris IX Dauphine*, 2ème année, Droit des obligations, sous la direction de Mme Lavagne.

2001-2003     ATER, *Université Paris IX Dauphine*, 2ème année, Droit des obligations, sous la direction de Mme Lavagne.

2000-2001     *Université Paris II,* Licence de droit - Droit des sociétés, Cours de M. le professeur Germain.


Connaissances linguistiques

Anglais       Excellentes connaissances, rédaction et négociation de contrats en anglais.
Allemand      Bonnes connaissances, étudiant au lycée français de Bonn.
Polonais      Résidant trois ans à Cracovie.

**Travaux scientifiques**

<u>Travaux et articles publiés</u> :

2007
- Le capital intellectuel – De l'apport en société de biens intellectuels, *Litec* 2007, coll. Bibliothèque de droit de l'entreprise.
- Commentaire sous l'arrêt Cass. civ. 1 du 31 janvier 2007, étude sur le droit moral et le domaine public, *Les Petites Affiches*, 19 juillet 2007, n° 144, p. 8.
- L'évaluation des actifs immatériels peut-elle servir pour évaluer le préjudice ? *Cahiers de droit de l'entreprise*, n°4 juillet-août 2007, p. 31.

2006
- Le cumul d'appropriation : du parfum au logiciel, *Communication Commerce Electronique,* décembre 2006, Etudes 36 p. 9.
- La légalité procédurale en droit des sociétés – A propos de la révocation, *Les Petites Affiches*, 12 septembre 2006, n° 182, p. 3.
- Les biens intellectuels - Contribution à l'étude des choses, *Communication Commerce Electronique,* juin 2006, Etudes 14 p. 8.

2005
- Note sous Cass. civ. 3, 14 sept. 2005, *JCP E* 2005, n° 1867, p. 2218, étude sur la bonne foi dans les contrats.
- Le capital intellectuel, *Communication Commerce Electronique,* juillet 2005, Etudes 32, p. 19.

2004
- Comment valoriser vos actifs incorporels dans le référentiel IFRS, *Option Finance* n° 806, 2 nov. 2004, p. 44, en collaboration avec J-S Lantz.
- L'application de l'article L. 214-1 du CPI aux diffusions télévisuelles, *Légipresse* n° 209, mars 2004, p. 23.

<u>Conférences</u> :

2007
- L'évaluation des actifs immatériels peut-elle servir pour évaluer le préjudice ?, *L'évaluation du préjudice de la contrefaçon*, Assemblée Nationale, Palais Bourbon, Paris, 4 juin.
- Co-direction scientifique et organisation du colloque, *La construction du droit d'auteur : entre autarcie et dialogue*, Université de Montpellier, 10 et 11 mai.
- Propriété industrielle et Valorisation, *Perspectives tunisiennes de la Propriété industrielle*, Séminaire à destination des entreprises et des créateurs, Tunis, Tunisie, 28 avril.
- Droit d'auteur et recherche universitaire, Université de Provence, 30 mars.

2006
- Les prévisions fiscales dans les contrats de la propriété intellectuelle, *La pratique contractuelle en droit de la propriété intellectuelle*, Assemblée Nationale, Palais Bourbon, Paris, 16 juin.
- Apport partiel d'actifs : dimensions juridique et économique d'une opération d'apport en nature de PI, *Les entretiens de Paris HEC-INPI*, Paris, 18 et 19 mai.

2005
- Droit d'auteur et théâtre, Académie d'Arts dramatiques de Shanghai, Chine, 26 mai.

| | |
|---|---|
| 2004 | - La régionalisation de la propriété intellectuelle, IEP, Paris, 2 mars. |
| 2003 | - Vers un nouveau statut pour les créations de salariés ?, EuroForum, Paris, 11 mars. |
| 2002 | - Cycle de 4 conférences/formations sur la recherche scientifique publique et la propriété intellectuelle, INSERM, Lille. |
| 2001 | - Cycle de 7 conférences d'initiation à la propriété intellectuelle, Groupement des écoles de télécommunication, ENST Brest, ENST Paris, INT. |
| | - Legal aspect of the Open Source Software, conférence pour les laboratoires de recherches de la Commission européenne, Ispra, Italie, mai. |

**BINCTIN EXPERT REPORT**

**EXHIBIT B**

**(FRENCH)**

Paris le 12 octobre 2007.

Je soussigné, Nicolas Binctin, Professeur de droit à l'Université de Poitiers, enseignant le droit d'auteur à la faculté de Poitiers et de Paris I Panthéon-Sorbonne, expose ce qui suit.

La société VAN CLEEF & ARPELS me sollicite afin que je lui fasse part de mon opinion juridique, en droit français, sur les questions suivantes :

1.  le modèle de bijoux de VAN CLEEF & ARPELS communément appelé « *Vintage Alhambra* » est-il protégeable par le droit d'auteur ?
2.  dans l'affirmative, qui, à l'origine, est titulaire des droits sur ce modèle ?

Mon opinion est sollicitée en vue d'être communiquée aux débats dans le cadre de différents procès se déroulant aux Etats-Unis et portant sur la contrefaçon dudit modèle.

Monsieur Frédéric Gilbert-Zinck, représentant de VAN CLEEF & ARPELS, me remet une représentation photographique du modèle en cause (jointe en Annexe …), ainsi qu'une attestation de Madame Micheline Roussier du 1er octobre 2007 décrivant les conditions et le contexte de la création de ce modèle (jointe en Annexe …).

Après avoir pris connaissance de ces documents, mon opinion est la suivante.

### 1.   *Le modèle de bijoux en question est protégé par le droit d'auteur*

Il n'est pas douteux, selon moi, que le modèle de bijoux qui m'est présenté est protégé par le droit d'auteur.

### a)   **Généralités**

Le droit d'auteur français est gouverné par un certain nombre de principes directeurs. L'un d'entre eux est posé à l'article L.112-1 du Code de la propriété intellectuelle (CPI) selon lequel : « *les dispositions du présent code protègent les droits des auteurs sur toutes les œuvres de l'esprit, quels qu'en soient le genre, la forme d'expression, le mérite ou la destination.* »
Cela signifie concrètement que le juge ne peut s'attacher à une famille d'œuvres (artistique, littéraire ou musicale) pour accorder la protection. Pas plus à une forme sous laquelle l'œuvre est communiquée ou au mérite de la création puisque dans notre système est aussi bien protégé le dernier prix littéraire français *Goncourt* qu'un panier à salades[1]. Dans ces conditions, rien n'interdit, au contraire, d'envisager la protection d'un bijou par le droit d'auteur. Par ailleurs, la destination d'une création (par ex. industrielle, commerciale, ou purement artistique) est sans incidence sur la protection par le droit d'auteur. Le droit d'auteur peut donc parfaitement s'appliquer à

---

[1] Crim, 2 mai 1961, JCP 1961 II 12242 ; Crim 3 octobre 1963, Bull. Crim n° 300.



un modèle de bijou diffusé dans le commerce, tel que celui qui m'est soumis dans le cadre de cette opinion.

**Il ne fait aucun doute que le modèle de bijou *Vintage Alhambra* présente un caractère exclusivement ornemental, esthétique. En conséquence, la protection par droit d'auteur s'impose avec évidence.**

**b)     Analyse du bijou Vintage Alhambra**

**Pour être protégé par le droit d'auteur**, le bijou examiné doit constituer une création de forme originale.

La **forme** du bijou Vintage Alhambra dépasse le stade de la simple idée. Ici celle qui consiste à reprendre la forme d'une fleur (ou d'un trèfle) pour un bijou.

La forme repose généralement sur deux éléments : le choix et la disposition des matières. Y a-t-il un choix et une disposition d'éléments particuliers dans la réalisation du *Vintage Alhambra* ? Assurément. Le créateur a choisi certains matériaux : des pierres par exemple, qu'il a agencé par la suite d'une certaine manière (par exemple un motif perlé entoure ainsi la forme du trèfle du bijou). Plus précisément, l'on peut dire que la forme du modèle qui m'est présenté repose sur la combinaison des éléments suivants :

1     Une forme spécifique, évocatrice d'un trèfle à quatre feuilles ;
2     Un liseré en or présentant un relief perlé ;
3     Contrastant avec l'intérieur constitué d'une pierre lisse ou d'un métal granuleux.

Plus précisément, le caractère *« exclusif »* selon le terme de Madame Roussier, ou original du motif Alhambra trouve son expression formelle dans chacun des éléments ci-après ainsi que dans leur combinaison spécifique :

(i)     quatre lobes semi-circulaires et parfaitement symétriques, réunis ensemble constituant une forme globale stylisée inspirée de celle d'un trèfle à quatre feuilles ;
(ii)    dont les bords sont légèrement surélevés de telle sorte qu'ils soulignent les lignes pures du contour de la forme constituée du quadrilobe symétrique ;
(iii)   ces bords étant au surplus soulignés au moyen d'un motif métallique perlé, qui contraste avec le caractère lisse (quand il est composé d'une pierre) ou granuleux (quand il est réalisé en métal) du centre du bijou ;
(iv)   le contraste entre les bords et le centre du bijou étant au surplus souligné par la différence de couleur existant entre les éléments en métal de couleur neutre et le centre coloré, en particulier lorsqu'il s'agit d'un bijou en corail, lapis ou turquoise.

L'originalité de l'Alhambra Vintage est au surplus caractérisé par une répétition du motif Alhambra tel que décrit ci-dessus espacé par intervalles réguliers.

Cette mise en forme de l'œuvre est parfaitement décrite dans l'attestation de

2



Madame Roussier.

« *Parmi tous les prototypes proposés par les Ateliers Richards & Wildenstein, j'ai finalement **choisi** une esthétique très exclusive : bord du motif perlé, rendu du métal granuleux puis **utilisation** de pierres dures comme le corail, le lapis, l'onyx, très à la mode dans les années 70* ».

L'on retrouve bien ces critères de choix et de disposition des matières.

Cette mise en forme de l'œuvre doit être **originale**, c'est-à-dire que le créateur doit déployer un minimum de fantaisie en échappant aux contraintes techniques. Il est certain ici que le créateur n'a pas été guidé par des contraintes techniques. Pourquoi en effet d'une part choisir le motif du trèfle, plutôt qu'un autre, et d'autre part, cette manière « exclusive » de le mettre en forme ? Pourquoi entourer cette fleur d'un motif perlé? Aucune contrainte technique n'a imposé une certaine forme à l'auteur du bijou étudié.

A cet égard, l'attestation de Madame Roussier indique que les choix artistiques ayant présidé à la création du bijou « Vintage Alhambra » sont intimement liés à l'univers esthétique de Van Cleef & Arpels : « *le trèfle porte-bonheur, comme d'une manière générale, l'univers floral, a toujours été un symbole chez Van Cleef & Arpels. Plusieurs déclinaisons du motif trèfle ont ainsi été réalisées, dont notamment le clip « cosmos » directement dérivé des bijoux Van Cleef & Arpels en forme de trèfle créés dans les années 30* ».

### c)    Exemples jurisprudentiels

Il faut ajouter enfin que le principe de la protection des bijoux par le droit d'auteur ne pose pas de difficultés en jurisprudence. Nous avons effectué une recherche jurisprudentielle pour les années 2005 2006, pour la seule Cour d'appel de Paris, 4 ° chambre sections A et B, et nous avons trouvé douze décisions qui se prononcent en ce sens.

Sans souci d'exhaustivité, l'on peut citer :

CA Paris 4° ch. Section A 20 avril 2005 :

« *Considérant qu'il s'ensuit que le bracelet Taxi créé par AG, dont la banalité n'est pas établie, est par l'agencement spécifique de ses perles en verre et argentées et de son pompon, le résultat d'un processus créatif qui porte l'empreinte de la personnalité de son auteur, de sorte qu'il bénéficie de la protection instaurée par le livre I er du Code de la propriété intellectuelle* ».

CA Paris 4° ch Section B 21 octobre 2005 :

« *Mais considérant que la société UBU ne revendique pas un genre correspondant à la totalité des bijoux ethniques mais un bijou dans sa configuration dont les premiers juges ont avec des motifs pertinents que la cour a fait siens a admis l'originalité sans*

3



*qu'aucune antériorité n'ait été valablement opposée »*

CA Paris 4° ch. Section B 16 juin 2006 :

*« La cour constate au vu des photographies …qu'il est constitué de l'association, en soi originale, d'un article de quincaillerie, à savoir un écrou, et d'éléments décoratifs répartis sur les faces extérieures de celui-ci, selon un agencement qui a été indéniablement recherché, que l'ensemble ainsi obtenu reflète la personnalité de son auteur et se révèle original »*

Dans le même sens, l'on peut encore se reporter aux décisions suivantes :

CA Paris 4° ch Section A 15 février 2006, 27 septembre 2006, 25 octobre 2006, 8 novembre 2006

CA Paris 4° ch Section B 1 er février 2006, 29 septembre 2006, 27 octobre 2006

**En conclusion :**
**Les bijoux sont bien protégeables en droit d'auteur français.**
**Dans ce cadre et au regard des éléments sur la base desquels nous émettons notre opinion (photographie du *Vintage Alhambra* et attestation de Madame Roussier), le modèle de bijou est bien protégé par le droit d'auteur.**

Mais à qui reviennent les droits ?

### 2.   *Sur la titularité des droits*

A la lecture de l'attestation de Madame Roussier, la qualification d'œuvre collective me paraît s'imposer avec évidence pour le modèle du bijou litigieux.

Cette notion propre au droit français étant délicate à cerner, j'en rappellerai brièvement les principes (a) avant de l'appliquer au cas d'espèce (b).

### a)   Rappel des principes gouvernant l'œuvre collective

Selon l'article L.113-2 al. 2 du CPI, *« Est dite collective l'œuvre créée sur l'initiative d'une personne physique ou morale qui l'édite, la publie et la divulgue sous son nom et dans laquelle la contribution personnelle des divers auteurs participant à son élaboration se fond dans l'ensemble en vue duquel elle est conçue, sans qu'il soit possible d'attribuer à chacun d'eux un droit distinct sur l'ensemble réalisé. »*



Selon la jurisprudence, cette qualification englobe des créations les plus diverses telles que : un journal [2], une encyclopédie [3], un dictionnaire [4], ainsi que des bijoux [5].

Il est important de souligner que de nombreux enjeux sont attachés à la qualification. Selon l'article L. 113-5 CPI : « *L'œuvre collective est, sauf preuve contraire, la propriété de la personne physique ou morale sous le nom de laquelle elle est divulguée. Cette personne est investie des droits de l'auteur* ».

**Les droits d'auteur naissent ici directement dans le patrimoine de l'entrepreneur sans qu'il soit nécessaire de passer par une cession de droits de propriété intellectuelle.** Ceci doit être souligné dans le droit français où l'on considère généralement que seule la personne physique peut être considérée auteur. Cette attribution des droits à la personne morale dans le cadre de l'œuvre collective se fait *ab initio* c'est-à-dire à titre originaire.

Quels sont les éléments constitutifs de l'œuvre collective ?

En ce qui concerne les éléments constitutifs, l'on peut dire qu'il faut un « maître d'œuvre » actif et l'absence de vocation de chaque contributeur au tout.

L'œuvre collective suppose un projet qui va être mené à bien par son promoteur qui en est le maître d'œuvre. Celui-ci peut être indifféremment une personne physique ou une personne morale, même si de fait, ce sera presque toujours une personne morale.

Ce maître d'œuvre doit encore assumer une direction, laquelle postule donc un lien de subordination et de dépendance.

L'article L.113-3 poursuit enfin en soulignant que l'entrepreneur qui a pris l'initiative de l'œuvre doit l'éditer, la publier, la divulguer.

Le second élément caractéristique de l'œuvre collective est l'absence de vocation de chaque contributeur au tout. Cela suppose donc nécessairement plusieurs contributions. Le texte exige (ce qui suscite de nombreux débats doctrinaux) une fusion de ces contributions qui doit être telle qu'il est impossible « *d'attribuer à chacun* » des contributeurs « *un droit distinct* ». Sans rentrer dans les discussions doctrinales relatives à cette formule mystérieuse, l'on peut dire simplement que l'œuvre collective est celle dans laquelle chacun des contributeurs ne peuvent prétendre avoir un droit sur le tout. Le journaliste qui signe un article s'identifie bien comme auteur de cet article, il ne saurait se dire auteur du journal ! De même celui qui a participé à l'élaboration d'un bijoux en proposant une esquisse préliminaire pour un bijou qui évoluera au gré d'échanges entre les membres d'une équipe composée de plusieurs designers, commerciaux, maquettistes, prototypistes, etc...et dirigée par un maître d'œuvre, ne saurait revendiquer la titularité du bijoux final

---

[2] Civ 1ère, 6 mai 1997, D. 1998 somm 190 obs. Colombet
[3] Civ. 1ère, 1er juillet 1990, D. 1970 769
[4] Trib. Comm. Paris, 5 janvier 1998, RIDA avril 1998 474
[5] CA Paris, 19 novembre 1991, « Cartier c/ Aurélien et autres », 90/014907 et 91/017090.

résultant du travail de tous.

## b)  Application au cas d'espèce

Au regard de l'attestation de Madame Roussier décrivant le contexte de sa création, les différents critères de l'œuvre collective rappelés ci-dessus se vérifient au sujet du modèle *Vintage Alhambra*.

Le pouvoir d'initiative et de direction de VAN CLEEF & ARPELS

Madame Roussier indique que, « *à cette époque* » (c'est-à-dire en 1968) « *la direction générale souhaitait proposer des modèles accessibles et modernes dans la gamme de bijoux que nous appelions « Boutique », en complément de la Haute-Joaillerie beaucoup plus onéreuse.* », et que c'est pour répondre à ce besoin que « Alhambra » a été conçu, à l'initiative de la direction de VAN CLEEF & ARPELS.

L'on retrouve ici un promoteur, un maître d'œuvre : la société SLEPRA du groupe VAN CLEEF & ARPELS.

Un préposé en la personne de Madame Roussier (salarié de 1955 à 1993).

La personne morale (SLEPRA), par l'intermédiaire de sa préposée (Madame Roussier), a assuré un véritable rôle de direction. Le processus de création décrit dans l'attestation de Madame Roussier démontre en effet un pouvoir de direction vertical, hiérarchique, allant de la direction vers le service artistique, puis vers les ateliers extérieurs, les choix esthétiques étant *in fine* effectués par Madame Roussier en sa qualité de Chef Dessinatrice, « *en liaison étroite avec la direction générale de la société.* »

La pluralité de contributions

Madame Roussier indique par ailleurs qu'elle dirigeait au sein de la société SLEPRA reprise depuis par le groupe VAN CLEEF & ARPELS, une équipe de créateurs (elle cite deux personnes, en indiquant qu'il y en avait d'autres). Elle ajoute qu'elle avait également recours à des prestataires externes pour la création des bijoux. Le travail d'équipe était donc la règle dans cette entreprise pour la conception des modèles.

S'agissant plus particulièrement de *Vintage Alhambra* , Madame Roussier indique que le prestataire externe « *Monsieur Wildenstein est intervenu de manière active en liaison avec la direction générale de VCA et moi-même dans la création de Alhambra. Son esthétique finale a en effet été le fruit de nombreux échanges entre mes services et l'atelier Richards & Wildenstein* », avant qu'elle ne choisisse le modèle qui sera finalement commercialisé.

La pluralité de contributions est donc patente : outre Madame Roussier, les personnes dont elle avait la responsabilité, la direction de VCA et les ateliers Richards & Wildenstein sont intervenus sur la conception de *Vintage Alhambra* .



Aucun de ces intervenants : membres de l'équipe de Madame Roussier, Ateliers sollicités pour la création du bijou ne sont en mesure de prétendre à un droit sur le tout (aucune prétention en ce sens n'a jamais été formulée).

<u>La divulgation par VAN CLEEF & ARPELS sous la marque « VAN CLEEF & ARPELS</u>

Madame Roussier indique enfin que « *l'Alhambra a d'abord été lancé aux Etats-Unis* », sans qu'il soit nécessaire de préciser que ce lancement a été effectué à l'initiative et sur les instructions de la société qui l'employait à l'époque : la SLEPRA, aujourd'hui reprise par VAN CLEEF & ARPELS, et ce sous la marque « VAN CLEEF & ARPELS ».

Madame Roussier souligne qu'il a ensuite été vendu dès 1971 dans les boutiques VAN CLEEF & ARPELS de la place Vendôme à Paris, puis dans le monde entier.

Au total, la description faite par Madame Roussier des conditions de création du modèle Alhambra Vintage accrédite incontestablement la qualification d'œuvre collective, au sens de l'article L.113-2 al. 2 CPI

Cette qualification déclenche l'application du régime prévu par l'article L.113-5 du CPI, de sorte qu'on doit en conclure que les droits sur la création en question ont, dès l'origine, été la propriété de la personne qui l'a divulguée, à savoir la SLEPRA, dont on m'indique qu'elle a été absorbée par VAN CLEEF & ARPELS.

*       *

**Conclusion :**

**Au vu de ce qui précède, mon opinion en droit français sur les questions qui m'ont été soumises est que :**

**Le modèle « Alhambra Vintage » est protégé par le droit d'auteur ;**

**Les droits d'auteur sur ce modèle sont, à l'origine, la propriété de la SLEPRA, et aujourd'hui de VAN CLEEF & ARPELS.**

Nicolas BINCTIN

ANNEXE 1



**ANNEXE 2**

J'ai été employée de la société SLEPRA (Groupe Van Cleef & Arpels – « VCA ») de 1955 à 1993 en qualité de Chef Dessinatrice – Créatrice. En cette qualité je supervisais, en liaison étroite avec la direction générale de la société, tout le processus de création des bijoux VCA, et avais la responsabilité d'une équipe de créateurs, tous employés par la société SLEPRA. Parmi cette équipe, on peut mentionner Françoise Rousseau, Alain Dirringer ... En complément, j'étais régulièrement amenée à travailler avec des ateliers et fabricants de bijoux extérieurs qui possèdent un savoir faire inégalé et parmi lesquels je cite, de mémoire, Lenfant, Péry, Lasbleiz, Janca, Mathon ou Richards & Wildenstein. Dans le cadre de projets précis et sur commande, je demandais ponctuellement à ces prestataires de contribuer à la création de bijoux pour le compte et sous l'étroit contrôle de VCA.

Je suis aujourd'hui à la retraite.

Au cours de ma carrière, j'ai notamment travaillé avec mon équipe sur des motifs inspirés du trèfle. Le trèfle porte bonheur, comme, d'une manière générale, l'univers floral, à toujours été un symbole chez VCA. Plusieurs déclinaisons du motif trèfle ont ainsi été réalisées, dont notamment le clip Cosmos, directement dérivé des bijoux VCA en forme de trèfle déjà créés dans les années 30.

En 1968, la France subissait de violentes émeutes étudiantes et je me souviens que c'est à cette époque, que nous avons abouti – dans le cadre de nos travaux et en étroite collaboration avec l'atelier Richard & Wildenstein – au motif trèfle aujourd'hui connu sous le nom de l'Alhambra.

A cette époque, la direction générale souhaitait proposer des modèles accessibles et modernes dans la gamme de bijoux que nous appelions « Boutique », en complément de la Haute-Joaillerie beaucoup plus onéreuse.

Monsieur Wildenstein est intervenu de manière active en liaison avec la direction générale de VCA et de moi-même dans la création de l'Alhambra. Son esthétique finale a en effet été le fruit de nombreux échanges entre mes services et l'atelier Richards & Wildenstein. Parmi tous les prototypes proposés par les ateliers Richards & Wildenstein, j'ai finalement choisi une esthétique très exclusive : bord du motif perlé, rendu du métal granuleux puis utilisation de pierres dures comme le corail, le lapis, l'onyx, très à la mode dans les années 70.

L'Alhambra a d'abord été lancé aux Etats-Unis et a connu un succès quasi-immédiat, les clientes adorant porter plusieurs sautoirs ensemble – c'était un style très « Van Cleef ». Fort de ce succès, Pierre et Jacques Arpels, alors en charge de VCA Paris, m'ont demandé de préparer, avec l'aide de mon équipe, un assortiment de sautoirs Alhambra pour le marché français. De mémoire, les premiers Alhambra ont été vendus dans notre boutique Place Vendôme en 1971 puis nos revendeurs et succursales l'ont distribué dans le monde entier.

Si j'en juge aujourd'hui par les nombreuses publicités et articles de presse présentant les Alhambra, un bijoux portant une empreinte forte de Van Cleef & Arpels est intemporel. Alhambra n'a pas pris une ride depuis 40 ans !

Enfin, je confirme, en tant que de besoin, que l'ensemble des droits attachés aux créations que j'ai réalisées ou contribué à réaliser lorsque j'étais salariée de VCA sont bien évidemment la propriété de VCA.

Micheline Roussier

A Paris, le 1er octobre 2007

<u>CERTIFICATE OF SERVICE</u>

**SABRINA BORGIA** declares that:

1.      I am an assistant with **KALOW & SPRINGUT LLP** attorneys for Plaintiffs in

the captioned proceeding, and that on the execution date which appears below, I caused to be

served via hand delivery the annexed  **DECLARATION AND EXPERT REPORT OF**

**PROFESSOR NICOLAS BINCTIN** upon the following addressees:

Kenneth Feldman, Esq.
Kalpana Nagampalli, Esq.
FELDMAN LAW GROUP
12 E. 41st Street – 16th Floor
New York, NY 10017
(Counsel for Defendants)

2.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that all of the

foregoing is true and correct.


Executed on October 15, 2007
New York, New York

By: _____
               Sabrina Borgia

**Exhibit C**

```
 1                                                        1

 2   DISTRICT COURT

 3   SOUTHERN DISTRICT OF NEW YORK

 4   -----------------------------------X

 5                         Consolidate Civil Actions

 6                            No. 07-CV-564(SAS)

 7

 8   VAN CLEEF & ARPELS LOGISTICS, S.A. et al

 9                   Plaintiff(s,)

10       - against -

11   LANDAU JEWELRY,

12                   Defendant(s.)

13   -----------------------------------X

14   VAN CLEEF & ARPELS LOGISTICS, S.A. et al

15                   Plaintiff(s,)

16       - against -

17   ZIRCONMANIA, INC., et al

18                   Defendant(s.)

19   -----------------------------------X

20   VAN CLEEF & ARPELS LOGISTICS, S.A. et al

21                   Plaintiff(s,)

22       - against -

23   JJ GOLD INTERNATIONAL, INC., d/b/a

24   LAUREN G. ADAMS, et al.

25   -----------------------------------X
```

1                                                                    2

2                            12 East 41st Street

3                            New York, NY 10017

4                            December 11, 2007

5                            11:00 A.M.

6

7          EXAMINATION BEFORE TRIAL OF MICHELINE ROUSSIER,

8    a witness on behalf of the Plaintiff herein, taken

9    by the Attorneys for Defendants, held at 12 East

10   41st Street, New York, New York, 10017, on

11   Wednesday, December 11, 2007, at 11 O'clock A.M.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                                                          3

2    A P P E A R A N C E S :

3

4        FELDMAN LAW GROUP

5        12 East 41st Street

6        New York, NY   10017

7        BY:  Kalpana Nagampalli, Esq.

8

9        KALOW & SPRINGUT LLP.

10       488 Madison Avenue

11       New York, NY   10022

12       BY:  Milton Springut, Esq.

13

14       RICHEMONT INTERNATIONAL SA

15       50 Chemin de la Chenaie

16       CH-1293 Bellevue Geneva

17       BY:  Marc Frisanco, Esq.

18

19   P R E S E N T:

20       Michael Duval

21       Martin Hoffman - Official French Interpreter

22                    Trans Lucid Interpreting

23

24

25

1                          Micheline Roussier                    7

2          COURT REPORTER:  Counselors, please note

3     your appearances for the record.

4          MR. FELDMAN:  Ken Feldman, from Feldman

5     Law Group, attorneys for the Defendants.

6          MS. NAGAMPALLI:  My name Kalpana

7     Nagampalli, attorney for the Defendants, and I

8     work for Feldman Law Group.

9          MR. DUVALL:  Michael Duvall,

10    M-I-C-H-A-E-L, I am the husband.

11         MR. FRISANCO:  Marc Frisanco, I'm the

12    property Counsel working for Richemont.

13         MR. SPRINGUT:  Milton Springut, Counsel

14    for the Plaintiffs.

15         THE WITNESS:  Micheline Roussier,

16    R-O-U-S-S-I-E-R, One Square, Andremalraux,

17    A-N-D-R-E-M-A-L-R-A-U-X, 92300

18    L-E-V-A-L-L-O-I-S hyphen, P-R-E-E-T, France.

19         (Whereupon, the witness was sworn through

20    the French Interpreter.)

21         THE WITNESS:  I swear to tell the entire

22    truth concerning all matters that will be

23    discussed.

24    MICHELINE ROUSSIER, after having first been duly

25         sworn by Raquel Torres, a Notary Public in and

1              Micheline Roussier                    8

2        for the State of New York, was examined and

3        testified as follows:

4    EXAMINATION BY

5    MS. NAGAMPALLI:

6        Q.    So you already stated your name and

7    address for the record?

8        A.    Yes.

9        Q.    And I'll just ask you a few basic

10    questions about your background, but before we get

11    into your background, I just wanted to ask you if

12    you've been in a deposition before?

13        A.    No, never.

14        Q.    Never in any country?

15        A.    No.

16        Q.    Okay, so do you know how the deposition

17    proceeds?

18        A.    Yes, I think so.

19        Q.    So basically today, I'm going to ask you

20    questions about this case.  If I ask you any

21    question and you don't understand it, you can stop

22    me anytime and ask me to repeat the question for

23    you.

24              Please state your answers verbally.  Do

25    not nod or shake your head, because that cannot be

Micheline Roussier                    9

1

2    recorded by the Court Reporter.

3         MR. SPRINGUT:  Counsel, I suggest that you

4         break up the long questions into short

5         questions and let him translate.

6         MS. NAGAMPALLI:  I'll try to do my best.

7    Q.   So what is your nationality?

8    A.   French.

9    Q.   Have you ever been to the United States

10   before?

11   A.   No, never.

12   Q.   Have you been on a business trip?

13   A.   No.

14   Q.   Who is paying for your trip right now?

15   A.   Van Cleef.

16   Q.   Van Cleef?

17        When did you arrive in the United

18   States?

19   A.   Last Friday, the 7th.

20   Q.   The 7th?

21        And you flew straight into New York?

22   A.   Yes, directly in, we flew directly in.

23   Q.   Does Mr. Springut -- is Mr. Springut your

24   lawyer?

25        MR. SPRINGUT:  Yes.

Micheline Roussier                    19

1

2       A.    Well, I sought ideas.  I showed them to

3   Mr. Descouleurs.  He advised me and then after that,

4   we showed the designs to Mr. Arpels.

5       Q.    Do you have any of those designs with you;

6   not when you were an assistant, but any documents

7   that you kept any sketches of when you were working

8   with the company?

9       A.    No, they stayed with Van Cleef.

10      Q.    So after you designed something and you

11  presented it to Monsieur Pierre, he would keep the

12  sketches?

13      A.    Yes, the Van Cleef company kept the

14  designs.

15      Q.    Is there a filing system where they keep

16  these documents?

17      A.    Yes, of course.

18      Q.    So for how long were you an assistant

19  designer?

20      A.    Two or three years.

21      Q.    Two or three years.

22            After that, what position did you hold

23  after you were an assistant designer?

24      A.    The position of chief designer, because my

25  colleague left Van Cleef.

1                           Micheline Roussier                    20

2          Q.    The person you were working as an

3    assistant designer with or you got the position

4    after your colleague left as chief designer?

5          A.    Yes.

6          Q.    When you say, "chief designer," does the

7    chief designer of the design department, which is

8    part of Van Cleef?

9          A.    Yes.

10         Q.    How many departments do they have; do they

11   have more than one creative department?

12         A.    There was just one creative department.

13         Q.    And you became the head of -- the chief

14   designer; what position is that, what is the highest

15   position, and where were you in comparison to

16   that?

17         A.    I was all by myself for sometime, and

18   later on, I had collaborators.

19         Q.    Alone for sometime; you were designing

20   alone for Van Cleef and Arpels France?

21         A.    Yes, the time it took us to find somebody

22   qualified.

23         Q.    On a regular basis, how many designers are

24   in the department, the design department?

25         A.    So, with including myself, two or three.

Micheline Roussier                    22

1

2    Q.    Do you remember what you were designing at

3    that point in time?

4    A.    It was jewelry, platinum and Brillant,

5    diamonds.

6    Q.    Van Cleef has names for the designs.  Did

7    any of your designs get a name also, like the

8    Alhambra, the Byzantine?

9         At that point when you were designing, did

10   they have any names?

11   A.    Yes, but later.

12   Q.    Later?

13   A.    Later.

14   Q.    By "later" do you mean after you submitted

15   your designs to Mr. Arpel?

16   A.    No, at later dates, because the pieces

17   that had names, were the ones that were with the

18   boutique.

19   Q.    So after you designed something, and then

20   when you became chief designer, who were you

21   reporting to?

22   A.    To Mr. Pierre Arpels and Jack Arpels.

23   Q.    Is there, at that point in time, do you

24   know if there was any connection between Van Cleef

25   Arpels, France and Van Cleef Arpels, New York?

1                  Micheline Roussier              25

2   design or Mr. Jack Arpel?

3         A.    Are you talking about my designs?

4         Q.    Yes.

5         A.    It was Mr. Jack Arpels and Mr. Pierre

6   Arpels only.

7         Q.    And Mr. Claude Arpels used to come and

8   take the jewelry after it was finished?

9         A.    Yes.

10        Q.    When did you start designing the Alhambra

11  jewelry?

12        A.    The Alhambra jewelry goes back, if my

13  memory serves me well, to around 1968.

14        Q.    Were there any other designs that were

15  similar to the 1968 Alhambra jewelry that you had

16  designed before?

17             MR. SPRIGUT:  Can you read that back?

18             (Whereupon, the referred to questions was

19        read back by the Court Reporter.)

20             MR. SPRINGUT: I object to that.  If she

21        understands.

22             MS. NAGAMPALLI:  She still has to answer

23        it.

24             I'll rephrase the question.

25        Q.    I want to ask, I just wanted to know if

Micheline Roussier                    26

1

2    there were any -- if there was any other jewelry

3    like the Alhambra jewelry existing in the Van Cleef

4    design house?

5        A.    There were -- was jewelry that inspired

6    the Alhambra, which were clover leaves, that we

7    called "Cosmos."

8        Q.    If I were to ask you to design the Cosmos

9    jewelry, would you be able to do that right now just

10   to give us a picture?

11       A.    I'm going to try.

12           (Pause.)

13       Q.    This is the Cosmos clip?

14       A.    Yes.

15       Q.    And were you, when you were going or asked

16   to design the Alhambra jewelry, was it based or

17   related to this design?

18       A.    I didn't design the Alhambra jewelry.  We

19   just wanted to be inspired by this little clover and

20   launched less costly jewelry for the boutique.

21           MR. SPRINGUT:  Can we have that marked?

22           MS. NAGAMPALLI:  Yes, but I still want to

23       ask her a few more questions.

24           MR. SPRINGUT:  Let's mark it so it's clear

25       on the record what you're asking.

Micheline Roussier                    27

1

2        MS. NAGAMPALLI:  Can we mark it as Exhibit

3    1.

4        (MARKED FOR ID:  Defendant's Exhibit 1.)

5    A.   It's approximate.

6    Q.   You just said that you used this as an

7    inspiration?

8    A.   Yes.

9    Q.   Are all your designs based on an

10   inspiration which -- based on jewelry that is

11   already part of the Van Cleef collection or did you

12   look to the existing trends at that time?

13       THE INTERPRETER: The interpreter would

14       like to have the question read back.

15       (Whereupon, the referred to question was

16       read back by the Court Reporter.)

17   A.   No, part of the jewelry was inspired by

18   the Van Cleef collection and part of it came from

19   our imagination.

20   Q.   Earlier you said that you didn't design

21   the Alhambra jewelry.

22   A.   Yes.

23   Q.   Who designed the Alhambra jewelry?

24   A.   It was really a communicative undertaking

25   between me and Mr. Wildenstein (Ph. Spelled.)

Micheline Roussier                28

1

2    Q.    When did you start working with Mr.

3    Wildenstein?

4    A.    I don't remember, but it was well before

5    the creation of the Alhambra.

6    Q.    Was he an employee or was he an employee

7    of Van Cleef Arpels at the time?

8    A.    No, he headed a manufacturing workshop.

9    They were one of our subcontractors.

10    Q.    Did van clean Arpels work with Mr.

11    Wildenstein on a regular basis?

12    A.    Yes.

13    Q.    Was this a work -- was this working

14    relationship an exclusive one?

15    Did he work inclusively for Van Cleef

16    Arpels or did he design, his workshop design for

17    other jewelry houses?

18    A.    Oh, yes, I believe so.

19    Q.    He was designing for other jewelry

20    houses?

21    A.    I believe.

22    Q.    Who do you think --

23    Who was Van Cleef's competition in the

24    jewelry business at that point in time?

25    A.    They're still the same ones now.  Cartier,

Micheline Roussier                29

1
2  Bucheron, they're still the same ones, etcetera.

3      Q.   So I'll go back to Mr. Wildenstein.

4           You said he had a manufacturing workshop.

5  Did he only manufacturer jewelry?

6      A.   No, he especially manufactured boutique

7  items.  Maybe some jewelry, but not a lot.

8      Q.   What is a boutique item?

9      A.   Things that are a little bit more

10  whimsical than jewelry, and at a more accessible

11  price.

12      Q.   Mr. Wildenstein, was he start of the

13  designing process?

14      A.   Designing?  I don't think he designed, but

15  he did participate in the creative process.

16      Q.   Could the witness elaborate on what is

17  "the creative process"?

18      A.   Well, we talked with Mr. Wildenstein about

19  doing an object for the boutique inspired by the

20  clover.  He worked on it.  There were a lot of back

21  and forth between us.  I don't recall if these were

22  drawings or models, and we worked a lot, and in a

23  few months, Mr. Wildenstein brought three colored

24  chains which were Alhambra chains, which were quite

25  beautiful, and I presented them to Mr. Pierre Arpels

1                        Micheline Roussier                    30

2    and he ordered them.

3        Q.    Is this the only inspiration for the

4    clover design?

5        A.    Yes, after that, we extrapolated.

6        Q.    With what other designs or just...

7        A.    No, we changed it a little bit and we

8    arrived at the form of the Alhambra.

9        Q.    This was the Cosmos design and then you

10   redesigned it, would you say that?

11       A.    We didn't redesign the motif, we did

12   samples in wax, and we ultimately came up with the

13   shape of the Alhambra, but after many tries.

14       Q.    How long did the tries take, normally?

15       A.    Oh, I don't remember.

16       Q.    Would you say the timeframe was months,

17   weeks or years?

18       A.    Of weeks and months, yes, but not years.

19       Q.    When it came to design the Alhambra, did

20   someone refer you to the Cosmos clip or was it your

21   own idea?

22           MR. SPRINGUT:  Objection.  Unintelligible.

23       Q.    Did you use, when you earlier said that

24   the Cosmos clip was used as part of the design

25   process, did you -- did someone tell you about the

1                    Micheline Roussier                    31

2   Cosmos clip, a Supervisor?

3       A.    No.

4       Q.    Did you think of it yourself?

5       A.    The Cosmos clip?  Yes.

6       Q.    And then who did you discuss this idea

7   with; did you think that you would do something

8   based on the Cosmos clip?

9             I'll restrict it to that.

10            Did you think you would design something

11  based on the Cosmos clip?

12      A.    No, we wanted to do variations and come up

13  with much more whimsical designs.  There were

14  drawings and models, I believe, and then we and we

15  finally came up with the Alhambra model.

16            MR. SPRINGUT:  Can we take a break?

17            MS. NAGAMPALLI:  For a small five minute

18      break sure.

19            MR. FELDMAN:  Anytime you want a break --

20            MS. NAGAMPALLI:  You can ask me for a

21      break anytime you feel like it.

22            THE WITNESS:  Okay, it's all right.

23            MS. NAGAMPALLI:  And if she needs to be

24      directed to the rest rooms, she can tell me and

25      I'll tell her where it is.

1              Micheline Roussier              32

2          (Whereupon, there was a break in the

3       proceedings.)

4          (Whereupon, the following occurred after

5       the break.)

6          MS. NAGAMPALLI:  Would you read back the

7       last question and answer before the break,

8       please.

9          (Whereupon, the referred to question and

10      answer was read back by the Court Reporter.)

11      Q.    In your answer, you keep referring to

12   "we."  Who is -- could you explain who -- all who

13   were involved?

14      A.    Well, the designer who were there then and

15   Mr. Wildenstein in this case.

16      Q.    Can I have the names of the designers that

17   were there?

18      A.    A few of them, yes, that I recall.  There

19   was Francois Rousseu, F-R-A-N-C-O-I-S-E,

20   R-O-U-S-S-E-O-U, Alan, A-L-A-I-N, last name

21   D-I-R-R-I-N-G-E-R.

22      Q.    Anyone else?

23      A.    Okay, well the ones that I just mentioned

24   were there for a long time, so I remember their

25   names, but I don't remember the others.

Micheline Roussier                    33

1

2    Q.    The others would be the designers or staff

3    or?

4    A.    They were designers, but we weren't very

5    satisfied with, so they didn't stay longer than six

6    months or a year.

7    Q.    And she said there was someone else other

8    than the designers, who were the other people?

9    A.    Took part in what?

10   Q.    The designing of the Alhambra jewelry?

11   A.    They were the subcontractors, so in the

12   case of the Alhambra, there was Mr. Wildenstein.

13   Q.    The first design of the Alhambra, did you

14   design it?

15   A.    No, it wasn't me.

16   Q.    Who designed it?

17   A.    At first there wasn't a design.  We

18   started out working with wax models that we

19   shaped.

20   Q.    When you say, "we," could you expand on

21   who was involved in making the wax model; just so I

22   can get a picture.

23   A.    There was Mr. Wildenstein who had them

24   done at his workshop.

25   Q.    This was before, before you discussed the

1                    Micheline Roussier                    34

2    Cosmos clip with him?

3        A.    No, the wax models were after.

4        Q.    After.

5              Can you give me details of the Alhambra

6    designs; you said first it was a wax model then what

7    were the next few steps?

8        A.    Well, once we found a wax model that we

9    found to be very beautiful, I think that we had many

10   different models.

11       Q.    Does Van Cleef keep these models?

12       A.    Maybe.  I don't know.

13       Q.    So the Alhambra was always based on a wax

14   model?

15            MR. SPRINGUT:  Objection.

16   Mischaracterizes the witness's testimony?

17            MS. NAGAMPALLI:  You still have to answer

18       the question.

19       A.    I didn't answer?

20       Q.    No.

21       A.    Could you repeat the question?

22            MS. NAGAMPALLI:  Please read it back.

23            (Whereupon, the referred to question was

24       read back by the Court Reporter.)

25            MR. SPRINGUT:  Same objection.

```
 1              Micheline Roussier              35
 2         THE WITNESS:  What do I do?
 3         MR. SPRINGUT:  You can answer.
 4    A.    So there could be sketches, there could be
 5  wax models, metal prototypes.  There was a certain
 6  amount of back and forth discussion, and maybe in
 7  the end a final design.
 8    Q.    So after the models did someone sketch it?
 9    A.    I don't remember at all.  That was 40
10  years ago.
11    Q.    So would you say that would these back and
12  forth discussions, were there any sketches involved,
13  do you remember?
14    A.    Probably.
15    Q.    And this was maybe through -- this
16  communication was carried over the phone, I
17  believe?
18    A.    No, Mr. Wildenstein came to Place Van Dome
19  and we sat down and discussed about creations.
20    Q.    Can you sketch the Alhambra for us right
21  now?
22         (Pause.)
23    Q.    This was the first Alhambra, this is the
24  Vintage Alhambra would you call this, a Vintage
25  Alhambra?
```

1                    Micheline Roussier                36

2            MR. FELDMAN:  Vintage.

3      A.    Yes, it was like this with little golden

4  bubbles, but not always (Indicating.)

5            MR. SPRINGUT:  Can we have that marked,

6      please.  Marked.

7            (MARKED FOR ID:  Defendant's Exhibit 2.)

8      Q.    When this design was being created, was it

9  called "Alhambra"?

10     A.    No, I think the name was given to it when

11 Mr. Pierre Arpel ordered the objects.

12     Q.    What did you refer to this design as?

13     A.    We called it "the motif we were working on

14 for the boutique."

15     Q.    Did you call this "a clover motif"?

16     A.    Not particularly.  We called it "The one

17 that looked like the Cosmos."

18     Q.    You called it "The one that looked like

19 the Cosmos"?

20     A.    Yes.

21     Q.    When you said, "golden bubbles," could you

22 explain what those bubbles exactly is, is it a

23 jewelry technical term?

24     A.    From the profile they look like this

25 (Indicating) and they were attached to the Alhambra.

Micheline Roussier                    37

1
2    It looks like a half circle.

3        Q.    And it's made of gold?

4        A.    But not often.  It didn't always -- we

5    didn't often do it that way, we intended to do them

6    with nothing.

7            MR. FELDMAN:  Let the record reflect the

8            witness has just been drawing to the right of

9            the original Alhambra design she drew.

10       Q.    So does golden bubbles in the center were

11   on some designs?

12       A.    For some of them, yes, they were.

13           MS. NAGAMPALLI:  Let the record also

14           reflect that the bubble is in the center of the

15           clover.

16       A.    I would maybe call them studs instead,

17   because when you say, "bubble," it makes you think

18   of something that's entirely round, where these are

19   like half circles.

20           MS. NAGAMPALLI:  I like to enter this on

21           the record too, that the witness first drew a

22           clover, an inner inlaid circle, and then shaded

23           it, and then drew four circles on the corners

24           where the clovers end.  Then when I asked her

25           if this is the way the Vintage Alhambra is

Micheline Roussier                    38

1
2    designed, she added a, not a bubble now, but a
3    stud in the center and said some of the Vintage
4    Alhambra has the stud in the center and it's
5    made of gold.
6         MR. SPRINGUT:  Note my objection to the
7    characterization of the witness's drawing and
8    testimony.  It is what it is.
9         Q.   Okay, when you were discussing the
10   Alhambra design with Mr. Wildenstein, how was it
11   made, with what materials?
12        A.   Made of hard stones.  We decided to make
13   it out of hard stones.
14        Q.   What are hard stones?
15        A.   Onyx, corral, lapis lazuli, and green
16   agate.
17        Q.   After you picked the material, and then
18   how is it, how does the design become the
19   Alhambra?
20             THE INTERPRETER: Could you repeat the
21        question?
22        Q.   After she picks the hard material, how
23   does it change into the Alhambra as we see or the
24   jewelry Alhambra; what is added to it, what changes
25   are made?

Micheline Roussier                    39

1

2      A.    Well, the hard stones are ground in order

3   to be able to fit them into the Alhambra, into

4   plates.

5      Q.    What is a plate?

6      A.    These are very -- these are plates of hard

7   stones that are integrated into -- they're fairly

8   thin plates of stone.

9      Q.    So this is a, the hard stone is slipped

10   into a thin plate?

11      A.    I was head designer, but I wasn't a

12   workshop Supervisor.

13      Q.    And okay, fine, so still my question is

14   has not been answered as to what are the other

15   things that are added to make it look like an

16   Alhambra.  The hard stone once it's chosen, what are

17   the other aspects that are added to the metal?

18          MR. SPRINGUT:  Objection.

19      Unintelligible.

20          MS. NAGAMPALLI:  It's a form objection

21      that's good enough.  I don't need the basis,

22      but she still has to answer.

23          THE INTERPRETER: The interpreter would

24      like to have the original question reread.

25          (Whereupon, the referred to question was

1          Micheline Roussier                40

2      read back by the Court Reporter.)

3          MR. SPRINGUT:  Note my objection.  It's

4      unintelligible.

5          MS. NAGAMPALLI:  Can you instruct the

6      witness that she still has to answer.

7      A.   I intend to, yes.  So the hard stones are

8  cut, and then we have a little gold dots that are

9  added around the edge.  The stones are held into

10 place above and below by this golden border.

11         MR. FRISANCO:  May I say something?

12         She said the stones are cut into four

13     loaves.  I don't think you said four loaves I

14     think she said when it was cut it was cut in

15     the shape of four loaves.

16         THE INTERPRETER: Do you want me to ask the

17     question again?

18         MS. NAGAMPALLI:  Do you want to clarify

19     the question?

20     A.   Okay, it's shaped like this, (indicating,)

21 but it's one solid piece.

22     Q.   It's one solid piece, and the dots are

23 added to it?

24     A.   Yes.

25     Q.   What would you say, is the difference

1                  Micheline Roussier            41

2    between this (Indicating,) and a clover?

3         MR. SPRINGUT:  And by "this" the record

4         should reflect that the questionnaire is

5         referring to the drawing in it's Exhibit 2.

6         Q.   What is the difference between that and a

7    clover?

8         A.   Well, a clover doesn't have this border or

9    the dots or the studs.  It's just the simple form of

10   nothing inside.

11        Q.   The dots in the center or the dots on the

12   corners?

13        A.   I'm not talking about the ones in the

14   center, because we didn't do that very often.  I'm

15   talking about the ones on the edge that makes a

16   difference between that and a clover.

17        Q.   When did you design the succeeding

18   Alhambra designs?

19        A.   Yes, I did some subsequently like

20   earrings, basically the same thing.  I'm not talking

21   about --

22        THE INTERPRETER: The interpreter would

23        like to as an aside, the French word "dessein"

24        is sometimes tricky to interpret, because it

25        could be "drawing" or "design," and it's not

Micheline Roussier                45

1  copyright designs at that point in time?

2  A.  No, the designs belonged to Van Cleef.

3  They're the ones that took care of copyrighting.  I

4  designed for the Van Cleef Company.

5  Q.  Did you ever design for anyone other than

6  Van Cleef?

7  A.  No, never.

8  Q.  Was there a legal department in Van Cleef

9  Arpels, France?

10  A.  Yes, I think so, yes.

11  Q.  Do you know when you were employed, were

12  there any cases or any actions that Van Cleef was

13  pursuing about with regards to any design?

14  A.  No, I don't recall.

15  Q.  When was this design approved by Mr., I

16  think, Jack Arpels?

17  A.  It was Mr. Pierre Arpels.  The piece, the

18  object was approved by Mr. Pierre Arpels, it was

19  around 1968.  We remember 1968 very clearly because

20  there were major riots then, so it's a date that

21  sticks in one's mind.

22  Q.  That is quite dramatic that your design

23  was approved during such riots?

24  A.  Well, it wasn't exactly during.

1                          Micheline Roussier                    46

2          Q.    So could you tell me the story of the

3    journey of the Alhambra after it was approved by Mr.

4    Pierre Arpels and when it hit the market?

5          A.    So since Mr. Wildenstein had manufactured

6    the three chains, I think that they were sold at the

7    store almost immediately.

8          Q.    I just have a question this is the store,

9    not the boutique?

10         A.    The Alhambra chains were at the boutique

11   not at the store.

12         Q.    Now it was first sold -- displayed in the

13   boutique in Place Van Dome?

14         A.    Yes, in the boutique at the Place Van

15   Dome.

16         Q.    Then what happened?

17         A.    So we saw how customers reacted, and if

18   they liked it we ordered them.  And then we

19   distributed them to the four other stores in France,

20   that is Cannes, Monte Carlo, Deauville and Paris.

21   And then Mr. Pierre must have ordered new models to

22   send them to Paris to Cannes, to Deauville.

23         Q.    To Paris?

24         A.    They were already in Paris, the first

25   three were in Paris, but then Mr. Pierre ordered

1                    Micheline Roussier                    47

2    others to send to Cannes to Deauville and to Monte

3    Carlo.

4        Q.    After that, it was -- this is just the

5    French market you're talking about?

6        A.    Yes.  So they sold well at first, but not

7    a huge amount, and then Mr. Claude came to Paris and

8    ordered some chains, and they were a big success in

9    New York.

10        Q.    You said that in 1968, is clear in your

11    mind would you remember the month?

12            MR. SPRINGUT:  The month of what?

13            MS. NAGAMPALLI:  Which month in 1968?

14            MR. SPRINGUT:  That what happened?

15            MS. NAGAMPALLI:  That the design was

16        approved.

17            THE INTERPRETER:  She said not at all.

18        A.    It could have been '68 or '69, because I

19    remember the events, but the exact month I couldn't

20    tell you.

21        Q.    Do you remember when Mr. Claude Arpels

22    bought these designs?

23        A.    I don't remember that either.

24        Q.    Would you remember if it was in the year

25    1968, 1969 or 70?

1                 Micheline Roussier          55

2      A.    Yes.

3      Q.    And were there any changes that you made

4 to the wax model or were the changes made by Mr.

5 Wildenstein?

6      A.    We made many different changes.  I believe

7 the first wax model wasn't just right.

8      Q.    Were these changes made by the design team

9 or you?

10      A.    No, I think it was Mr. Wildenstein who

11 made them.

12      Q.    So I just want to clarify, these models

13 were Mr. Wildenstein's?

14      A.    I gave him -- I gave him instructions or

15 indications, and he came back to me with models.  I

16 was overseeing quite a few things at the time.  We

17 had many different subcontractors and I had other

18 preoccupations other than those linked to the

19 Alhambra.  So I gave instructions and usually it was

20 the subcontractors who brought the models that we

21 worked on together.

22      Q.    So you never created the model in your

23 office, the wax model in your office?

24      A.    Yes, sometimes I did.

25      Q.    And --

1                    Micheline Roussier              56

2        A.    Sometimes, not always.

3        Q.    I just want to clarify, whether the first

4    model and the changes that were made were being made

5    in your offices or in the manufactures factory or

6    workshop?

7        A.    I don't recall.

8        Q.    Earlier you said that it wasn't you who

9    designed it, you who designed the Alhambra?

10       A.    I didn't design the Alhambra.

11       Q.    Who designed it?

12       A.    Well, I don't know who designed it,

13   because we started with the idea from the Cosmos for

14   which we did models, a number of them and after

15   that, it wasn't a creation, it was copies of models

16   that we had made.

17       Q.    The team of people that you've listed who

18   assisted you, the designers and Mr. Wildenstein, do

19   you know where they are right now; are they still

20   with Van Cleef?

21       A.    Mr. Wildenstein was already quite an

22   elderly man when I knew him.  He died quite some

23   time ago.  As for the designers, Mr. Dirringer went

24   to live on Reunion Island, if I recall, but I

25   haven't had any news from him.  As for Ms. Rousseou,

1                    Micheline Roussier                57

2    I have no idea what has become of her.

3        Q.    So the Alhambra, so your design team has

4    always been part of Van Cleef Arpels?

5        A.    Well, yes.  Unless I don't understand your

6    question.

7        Q.    In the sense that the design bureau is

8    owned operated and run by Van Cleef Arpels?

9        A.    Yes, yes.

10       Q.    What is Slerpa (Ph. Spelled.)

11       A.    It's Arpels spelled backwards.

12       Q.    Does it stand for something; do these

13   individual letters stand for any name; is it an

14   acronym?

15       A.    No, it was a company that was part of Van

16   Cleef.  I don't know what that represents.

17       Q.    Are you saying so Slerpa is another

18   company?

19       A.    No, it was part of Van Cleef.

20       Q.    Is it a department?

21       A.    I have no idea how these corporate things

22   work.  I worked for Van Cleef and Arpels and there

23   was Slepra (Ph. Spelled,) but I was with Van Cleef

24   and Arpels.

25       Q.    You're saying that it was Van Cleef and

1          Micheline Roussier          58

2     Arpels, but it was Slepra.  Can you explain that?

3              I don't follow the connection.

4     A.    I don't know either.  As a designer, I

5     don't have any idea what Slepra was in connection

6     with Van Cleef and Arpels.

7     Q.    But you were employed by Van Cleef and

8     Arpels?

9     A.    I was an employee of Slepra.

10    Q.    Not an employee of Van Cleef and Arpels?

11    A.    No, Slepra.

12    Q.    So then you received your paychecks or

13    anything related to your employment was signed by

14    Slepra?

15    A.    Yes, I think so.

16    Q.    After the Alhambra was designed, did you

17    speak to anyone in the marketing department or were

18    you involved with the catalogs that were released

19    afterwards?

20    A.    No, I didn't handle anything with the

21    sales department.

22    Q.    When the final design was created, what

23    was it; was it a necklace or a ring or an earring?

24    A.    A necklace.  A chain, a fairly long one.

25    Q.    What do you know about this case, what are

M. Roussier                                  84

1

2       A    Yes.

3       Q    If you would turn it over, it would

4    still be the same metal and the same design?

5       A    Exactly the same.

6       Q    It always has been the same from the

7    time it was created?

8       A    Yes.

9       Q    I just want the list of the materials

10   that might be in it.  Like what kind of

11   materials do you generally use; coal,

12   diamonds?  What are the variations that an

13   Alhambra might have like metal or like studs?

14   What would change in the variation of the

15   Alhambra?

16       A    We used yellow gold or white gold.

17       Q    In what part; the whole design?

18       A    It depended. Sometimes the edge could

19   be in yellow gold and the inside could be

20   white gold or gray gold. Instead of having the

21   hard stone, we sometimes have white gold or

22   the middle could be with little diamonds

23   everywhere or hard stones.  In the beginning,

24   we had Lapis Lazuli, coral, green agate, then

25   we had onyx, Tiger's Eye, Mother Of Pearl.

M. Roussier                    85

1
2    That's about everything.

3       Q    Diamonds and platinums are also

4    used --

5       A    Platinum, I don't think so. It was

6    too expensive. It would have made the jewelry

7    much more expensive.  Silver maybe now. I

8    don't know.

9       Q    Would you say as a designer that you

10    had to put together the different colors that

11    are going to be used in the finished piece of

12    Alhambra?

13       A    Generally, in a piece there was only

14    one color; all blue, all pink. Sometimes our

15    customers wore two chains or three chains. I

16    think it said here actually somewhere.

17       Q    Blue or pink, you said?

18       A    Blue or rose that being Lapis Lazuli

19    or coral.

20       Q    Now that I understood you used blue

21    or pink, would you tell the manufacturer that

22    you wanted it in blue or pink or the

23    manufacturer makes that decision?

24       A    No, we decided.

25       Q    Would you make the molds for this?

M. Roussier                                    86

1

2      A    They were made once and then used for

3   all of the pieces. Once the molds were made

4   from the model, you used it for all of the

5   objects.

6      Q    When you retired, the Alhambra was

7   still being made by the workshop that you

8   worked with?

9      A    No.

10      Q    Did the manufacturer change during

11   the course of your employment?

12      A    Yes, the manufacturer changed at the

13   end of my employment.

14      Q    Do you know who the new manufacturer

15   is?

16      A    I don't know.

17      Q    Going back to when you first designed

18   the Alhambra. Did you see any other clover

19   jewelry other than the Cosmos clip?

20      A    There is jewelry that is clover

21   shaped, but that is different from the

22   Alhambra. There is four leafed clover. It is

23   in nature, but it is not the same as ours.

24      Q    Do you know, for example, I think

25   Louie Vitton makes clover jewelry and they

M. Roussier                                    87

2   have a clover shaped and diamonds inside it.

3   Do you think that's like the Alhambra?

4            MR. SPRINGUT:  Objection; lack

5        of foundation.

6        A    I don't know what Louie Vitton makes

7   because it has been some years that I haven't

8   been concerned with jewelry.

9        Q    As you said, you said there are other

10  people you know who makes clover jewelry and

11  they are different from yours. Would you say

12  it is because they don't have the border in it

13  or what elements --

14            MR. SPRINGUT:  Objection;

15        ambiguous and to form.

16       A    First, there was no border, and then

17  the shape itself can be different. The four

18  leaf clover is something that exists in

19  nature. That is something very different from

20  this which has a particular form.

21       Q    Did the Cosmos clip have the form

22  that you are talking about?

23       A    You mean the shape of a clover leaf?

24       Q    Yes.

25       A    More than the Alhambra does. It was

1                    M. Roussier                    106

2        A    Yes.

3        Q    I saw sometimes it said attestation

4   and sometimes declaration?

5        A    I didn't write that part.

6        Q    Is Mr. Frisanco your lawyer?

7        A    No.

8        Q    Did he fly in with you?

9        A    No.

10       Q    Did he counsel you about this case?

11       A    We spoke about it. I said what I had

12   to say. Nobody gave me advice.

13       Q    What was the last thing?

14       A    Nobody gave me advice.

15       Q    He is not your counsel. When did you

16   meet him?

17       A    I met him at the end of September

18   together with Mr. Zinck who I had known for

19   some time. We had lunch together. I told him

20   what I know about the Alhambra. I was one of

21   the rare people who knew or remembered that

22   chain, and they wanted to have information

23   about it, and that's how I made the

24   acquaintance of Marc Frisanco.

25       Q    Do you think the chain is an

M. Roussier                                    107

2    important part of the design?

3        A    The chain, itself, no.

4        Q    The placement?

5        A    From an aesthetic point of view, of

6    course, it is important. The Alhambra is a

7    pattern, but the chain is just a standard

8    item. It has nothing special about it. The

9    placement of the motif along the chain is a

10   particular aspect of the Van Cleef's object.

11       Q    Can you explain the placement to us?

12       A    It was original, the motif itself,

13   but there is also the idea of having placed

14   the motif like this because we could have done

15   it like this, like this, like that

16   (indicating). It is a fact we have a necklace

17   with the motif spaced this way.

18       Q    Is there a particular or does Van

19   Cleef have a set way that it spaces it?

20       A    They are always spaced about the same

21   way. Neither too close or not too far apart.

22   It creates a pretty balance.

23       Q    Is there a particular number of the

24   Alhambra that you choose for a chain?

25       A    The quantity of motifs?

M. Roussier

138

about Mr. Pierre Arpel's approving the three

necklaces that you showed him?

    A    Yes.

    Q    That is correct?

    A    That is correct.

    Q    Then you told us about the three

necklaces being put into the boutique in

Paris; is that correct?

    A    Exactly.

    Q    How do you know that?

    A    There were papers we would fill out

when we sent objects to the store, and we

filled them out for the three, I believe, and

they were delivered, and I believe they were

at the store within a week about.

    Q    Within a week after Mr. Pierre Arpel

approved the designs?

    A    Yes. As soon as the objects were

manufactured, it was very quick.

    Q    And they were manufactured with the

approval?

    A    The necklaces were put at the

boutique very quickly, and then Mr. Pierre

Arpel ordered what we called repeats, that is

M. Roussier

139

1

2    to say other necklaces.

3        Q    More necklaces?

4        A    Yes, more.

5        Q    In the general course of what went on

6    in the Van Cleef process, how long would it

7    have taken from the time he requested more

8    necklaces to the time they were actually

9    manufactured?

10       A    I think it was between two and three

11   months.

12       Q    That was the general course of how

13   long it took things to get manufactured?

14       A    For that kind of object, yes.

15       Q    That would have been an order placed

16   to Mr. Wildenstein for some additional

17   necklaces?

18       A    Yes, certainly.

19       Q    The three necklaces at the very

20   beginning, they were put right away on the

21   shelves in the boutique?

22       A    Yes; as with all new items.

23       Q    Does it mean they were available for

24   sale to anybody who came into the boutique and

25   liked them?

1                         M. Roussier                    140

2          A    Yes, they were for sale.

3          Q    Do you know what happened to the

4     three necklaces?

5          A    They were sold, but I don't know to

6     whom.

7                    MR. SPRINGUT:  That's fair

8          enough.

9          Q    I will show you a document that you

10    saw earlier this afternoon. It is Defendants

11    Exhibit 11. Hopefully, it is before you

12    somewhere. This is a copy of your statement;

13    is that correct?

14         A    Yes, that's true.

15         Q    You told us you signed it and that it

16    is your signature on the back?

17         A    That's my signature.

18         Q    Before you signed it, did you read it

19    carefully to make sure that it was totally

20    correct?

21         A    Yes, I read it.

22         Q    Was everything correct in it before

23    you signed it?

24         A    Of course.

25         Q    Did you have to make any changes in

1                    M. Roussier                    141

2    it before you signed it?

3         A    I made changes to previous

4    declarations.

5         Q    This declaration was correct when you

6    signed it?

7         A    Yes, right.

8         Q    Do you agree that today everything in

9    here is still correct as far as you know?

10        A    I still agree.

11        Q    Look at the last paragraph on the

12   first page of the declaration which says

13   "Alhambra was first launched in the United

14   States." Is that correct?

15        A    Yes.

16        Q    What did you mean by that?

17        A    That it had a greater success in the

18   United States than in France at first at

19   least.

20        Q    But that doesn't mean that the items

21   were not first sold in France, does it?

22        A    No. It means that it had much greater

23   success in the United States than in France in

24   the beginning.

25        Q    The end of that paragraph, it says

1                              M. Roussier                    142

2          "More or less, as I recall, the first

3       Alhambra pieces were sold in our boutique at

4       Place Vendome in 1971." Do you see that?

5          A    I don't remember the dates anymore

6       exactly.

7          Q    The question is what did you mean by

8       that statement? I think you told us today that

9       the first time the Alhambra design was put on

10      sale at Place Vendome was sometime in 1968; is

11      that correct?

12         A    Yes. The first three ones were during

13      1968, but for the repeats I can't tell you

14      exactly what dates they were sold.

15             MS. NAGAMPALLI:  I objected to

16         that.

17         Q    You told us the people involved in

18      the creation or design of the Alhambra were

19      yourself, Mr. Wildenstein, and you identified

20      some other designers who were Francoise

21      Rousseau and Alain Dirringer as well; is that

22      correct?

23         A    As I recall, there was Francoise

24      Rousseau.  I think Alain Dirringer joined

25      later.

M. Roussier

143

1

2     Q     What was the nationality of these two

3     designers?

4     A     They were both French.

5     Q     And Mr. Wildenstein, his nationality?

6     A     I think he was French too.

7     Q     Where was all the design and creation

8     work done; what country?

9     A     In France.

10    Q     I don't know if you know this.  The

11    defendants claimed that the origin of the

12    Alhambra designed was the quatrefoil used by

13    the US Army 88th Infantry Division. Have you

14    heard that before?

15    A     No, I wasn't aware.

16    Q     Were you aware of a particular US

17    Army division when you and your team designed

18    the Alhambra?

19    A     No, not at all.

20    Q     Have you ever heard of the US Army

21    88th Infantry Division?

22    A     No.

23    Q     Have you ever seen any patches or

24    jewelry that comes from the US Army 88th

25    Infantry Division?

M. Roussier

144

1

2      A    No, I have never seen any.

3           MR. SPRINGUT:  I will ask the

4      court reporter to mark a two page document

5      as Plaintiffs Exhibit 1.

6           ( Plaintiffs Exhibit 1, Two page

7      document, marked for identification.)

8      Q    Can you look at what we marked as

9      Plaintiffs Exhibit 1 and specifically the

10     second page.

11     A    Yes.

12     Q    Have you ever seen the patch or the

13     design shown in the second row down third from

14     the left?

15     A    No, this is the first time.

16     Q    Is it fair to say that patch had no

17     basis or any input for you when you created

18     the Alhambra design?

19          MS. NAGAMPALLI:  Objection.

20     A    No, it played no role.

21     Q    Does the Alhambra design that you

22     have spoken about all of today have any

23     creativity beyond the design which is on the

24     second row third from the left?

25     A    I'm not sure I understood.

M. Roussier                          145

1

2          MR. SPRINGUT:  I will try again.

3          Q    The Alhambra design that your staff

4     and Mr. Wildenstein created, does it have

5     elements that go beyond the design which is

6     shown on the second row third from the left?

7          A    Yes, of course, there are additional

8     elements.

9          Q    Those are the elements you discussed

10     all afternoon?

11          A    Yes.

12          MR. SPRINGUT:  Off the record.

13          (Discussion off the record.)

14          MR. SPRINGUT:  Nothing further.

15     Thank you, very much.

16          MR. FELDMAN:  We want to state,

17     for the record, that the judge had

18     actually said you can't depose your own

19     witness. I take it this was

20     cross-examination.  Even though it went

21     outside the realm of different

22     questioning, we allowed it as a courtesy.

23     We will take a break, and we will be back

24     with our redirect.

25          ( Recess taken.)

M. Roussier

152

1
2      MR. FELDMAN:  I'm done. Thank
3  you.
4        (Time Noted: 7:05 p.m.)
5
6

                   MICHELINE ROUSSIER
7

Subscribed and sworn to before me

8  this _____ day of _____, 2007.
9

        NOTARY PUBLIC

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

M. Roussier                    155

1

2                          C E R T I F I C A T E

3

4          I, RAQUEL TORRES, a Notary Public

5      within and for the State of New York, do

6      hereby certify:

7              That the witness whose deposition is

8      hereinbefore set forth, was duly sworn by me

9      and that such deposition is a true record of

10     the testimony given by such witness.

11             I further certify that I am not

12     related to any of the parties to this action

13     by blood or marriage; and that I am in no way

14     interested in the outcome of this matter.

15             IN WITNESS WHEREOF, I have hereunto

16     set my hand this 18th day of December 2007.

17

18

19

20                    *Raquel Torres*

21                    RAQUEL TORRES

M. Roussier                                    156

1

2                    C E R T I F I C A T E

3

4         I, WALTER CHIRIBOGA, JR., a Notary Public

5    within and for the State of New York, do

6    hereby certify:

7              That the witness whose deposition is

8    hereinbefore set forth, was duly sworn by me

9    and that such deposition is a true record of

10   the testimony given by such witness.

11             I further certify that I am not

12   related to any of the parties to this action

13   by blood or marriage; and that I am in no way

14   interested in the outcome of this matter.

15             IN WITNESS WHEREOF, I have hereunto

16   set my hand this 18th day of December 2007.

17

18

19

20              *Walter Chiriboga, JR*

21              WALTER CHIRIBOGA, JR.

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

VAN CLEEF & ARPELS                          :
LOGISTICS, S.A., VAN CLEEF &                :
ARPELS, INC., and VAN CLEEF &               :
ARPELS DISTRIBUTION INC.,                   :
                                            :
                                            :
                    Plaintiffs,             :
                                            :
            - against -                     :
                                            :
LANDAU JEWELRY and JOHN                     :
DOES 1-10,                                  :
                                            :
                    Defendants.             :

------------------------------------------------------ X
------------------------------------------------------ X

VAN CLEEF & ARPELS                          :
LOGISTICS, S.A., VAN CLEEF &                :
ARPELS, INC., and VAN CLEEF &               :
ARPELS DISTRIBUTION INC.,                   :
                                            :
                    Plaintiffs,             :
                                            :
            - against -                     :
                                            :
ZIRCONMANIA, INC., JACOB                    :
HASSIDIM, and  JOHN DOES 1-10,              :
                                            :
                    Defendants.             :

------------------------------------------------------ X



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/24/08

<u>**OPINION AND ORDER**</u>

07 Civ. 564 (SAS)

```
------------------------------------------------- X
VAN CLEEF & ARPELS                     :
LOGISTICS, S.A., VAN CLEEF &           :
ARPELS, INC., and VAN CLEEF &          :
ARPELS DISTRIBUTION INC.,              :
                                       :
              Plaintiffs,              :
                                       :
          - against -                  :
                                       :
JJ GOLD INTERNATIONAL, INC.            :
d/b/a LAUREN G. ADAMS, THE             :
YELLOW DOOR, R&R REPLICAS,             :
and JOHN DOES 1-20,                    :
                                       :
              Defendants.              :
------------------------------------------------- X
```

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Van Cleef & Arpels Logistics, S.A., Van Cleef & Arpels, Inc., and

Van Cleef & Arpels Distribution Inc. bring this action alleging infringement of

their copyright and trade dress rights in the jewelry design known as "Vintage

Alhambra" (the "Design"), as well as unfair competition.  Following the close of

discovery, the parties cross-moved for partial summary judgment on certain

elements of their copyright and trade dress claims.[1]  This Opinion addresses only

---

[1]    The parties have styled their instant motions as partial summary
judgment motions on, for example, the "issue" of plaintiffs' ownership of a valid
copyright.  Defendants "are entitled to summary judgment if they can show that at
least one requisite element of [plaintiffs' copyright] claim cannot be proven."
*Torah Soft Ltd. v. Drosnin*, 136 F. Supp. 2d 276, 282 (S.D.N.Y. 2001).  Rather

the parties' motions with respect to the copyright claim. For the reasons set forth

below, I hold that plaintiffs own a valid copyright in the Design.

## II.    BACKGROUND

### A.    Facts[2]

#### 1.    The Van Cleef & Arpels Plaintiffs

Plaintiffs are corporations engaged in the business of designing,

---

than summary judgment, however, what the parties seek here is more properly
understood to be the Court's decision as a matter of law only on whether a certain
element of plaintiffs' claim has been met. Although I do not typically entertain
motions on discrete elements of a claim, I have made an exception here because of
the potential benefit to narrowing the issues for trial.

[2]    The following facts are taken from Defendants' Local Rule 56.1
Statement of Facts Not in Dispute ("Def. 56.1") and Plaintiffs' Revised Reply to
Defendants' Statement of Undisputed Facts, and Statement of Material Facts
Pursuant to Local Rule 56.1 ("Pl. 56.1").
    The Court notes that defendants' Rule 56.1 statement consists of ten
purportedly undisputed facts without citations to supporting evidence. Plaintiffs
have submitted responses to those facts, as well as ten other purportedly
undisputed facts in support of their cross-motion, to which defendants have failed
to reply. In light of the inadequacy of these statements and the parties'
questionable compliance with Rule 56.1, the Court exercises its "broad discretion
to determine whether to overlook a party's failure to comply with local court
rules" and "opt[s] to conduct an assiduous review of the record," to the extent it
has been provided in support of the motions. *Holtz v. Rockefeller & Co., Inc.*, 258
F.3d 62, 73 (2d Cir. 2001).
    For facts that provide background, cannot reasonably be in dispute,
and are not material to these motions, the Court draws from plaintiffs' complaint
in the action bearing civil docket number 07 Civ. 564, and the parties' submissions
in support of their motions.

3

creating, and selling high-end jewelry, timepieces, and related goods.[3] Prior to

2000, the companies comprising "Van Cleef & Arpels" included France-based

Van Cleef & Arpels, S.A., which served as the flagship company, and the Société

de Lapidaires et Professionnels de la Recherche Artistique ("SLERPA"), a

separate wholly-owned subsidiary that functioned as the "design house" for the

products sold in the stores and boutiques.[4] Jacques and Pierre Arpels served as the

heads of Van Cleef & Arpels, S.A.[5] During this period, another Arpels brother

headed a separate company incorporated and operating in New York called Van

Cleef & Arpels, Inc., which manufactured some of its own jewelry but also

imported some from Van Cleef & Arpels, S.A.[6]

In 1999, the Richemont Group acquired the Van Cleef & Arpels

companies. SLERPA was merged into Van Cleef & Arpels, S.A. and the assets of

both were taken over by an entity called Van Cleef & Arpels Holding France. All

of the intellectual property assets owned by SLERPA or Van Cleef & Arpels, S.A.

---

[3]    *See* Complaint ("Compl.") ¶ 12.

[4]    Plaintiffs' Revised Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment and in Support of Cross-Motion for
Partial Summary Judgment ("Pl. Opp.") at 3. *Accord* Declaration of Frederic
Gilbert-Zinck, plaintiffs' witness, attached to Pl. Opp., ¶ 5.

[5]    *See* Pl. Opp. at 3.

[6]    *See id.*

were later transferred to plaintiff Van Cleef & Arpels Logistics, S.A., a company incorporated and operating in Switzerland.[7]

Plaintiffs Van Cleef & Arpels, Inc. and Van Cleef & Arpels Distribution, Inc. are among the corporate affiliates of Van Cleef & Arpels Logistics, S.A.[8] Following the acquisition in 1999, all entities are now part of the Richemont Group. Van Cleef & Arpels, Inc. is a licensed importer of the brand's products and the "exclusive licensee for the sale of such products at retail in the United States."[9] Van Cleef & Arpels Distribution, Inc., the New York corporation, is also a licensed importer and the exclusive licensee for the domestic sale of the brand's products at wholesale.[10]

## 2.    The Vintage Alhambra Design

Plaintiffs claim copyright ownership over the Vintage Alhambra jewelry design consisting of the quatrefoil shaped charm or pendant, an outer metal border, fine beading on the border, larger corner beads or studs at each corner of the quatrefoil, in-laid material such as semi-precious stone, and the

---

[7]    *See id.* at 4. *See also* Compl.¶ 1.

[8]    *See* Pl. Opp. at 4. Van Cleef & Arpels, Logistics, S.A. recently changed its name to Van Cleef & Arpels, S.A. (Switzerland). *See id.*

[9]    Compl. ¶ 2.

[10]    *Id.* ¶ 3.

spacing of the quatrefoil charms along the chain for necklaces and bracelets.[11]
Van Cleef & Arpels, Inc. applied for copyright registration of this jewelry design
as an artistic work, and its application was received by the Copyright Office on
January 7, 1976.[12] According to its application, the date of the work's first
publication was October 31, 1968, in the United States.[13]

By submission to the Copyright Office dated December 13, 2006,
Van Cleef & Arpels, Inc., via counsel, notified the Copyright Office that it was
correcting its copyright registration to reflect information that had been recently
discovered. Specifically, the date and location of first publication was corrected
from October 1968 to November 1970 and from the United States to France.[14] In a
subsequent submission dated November 13, 2007, Van Cleef & Arpels, Inc. made
further corrections to its copyright registration, noting that the original date of
publication, October 31, 1968, was in fact correct. It also noted that it was not the

_____

[11]     See Pl. Opp. at 14.

[12]     See 1/7/76 Application for Registration of a Claim to Copyright, Ex.
1 to Compl.

[13]     See id.

[14]     See 12/13/06 Statement Regarding Copyright Registration, Ex. C to
Revised Declaration of Tal S. Benschar, plaintiffs' counsel ("Benschar Decl.").

author of the work, as listed in the original copyright application, but that the author was SLERPA.[15]

### 3.    88th Infantry Division of the U.S. Army

The 88th Infantry Division of the U.S. Army (the "88th Division") uses a quatrefoil or clover shape as its official insignia.[16] This shape is usually blue in color and is most frequently found on the 88th Division's paraphernalia such as shoulder patches worn on the sleeves of its members' uniforms.[17] The clover insignia has also appeared on Army-approved sweetheart jewelry and lapel pins.[18] According to the Department of the Army, the insignia has been in continuous use since 1917.[19]

### B.    Procedural History

Plaintiffs filed three separate actions in this Court, each alleging copyright infringement, trade dress infringement under the Lanham Act and

---

[15]    *See* 11/13/07 Second Statement Regarding Copyright Registration, Ex. C to Benschar Decl.

[16]    *See* Def. 56.1 ¶1.

[17]    *See, e.g.*, Trademark License Agreement between Department of the Army and Zirconmania, Inc., Ex. C to Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def. Reply"), ¶ A5.

[18]    *See id.*

[19]    *See id.*

common law, as well as unfair competition. Two of these actions were

consolidated into the lead case bearing civil docket number 07 Civ. 564 and closed

by an Order of Consolidation dated April 13, 2007. Following the close of

discovery, the parties cross-moved for partial summary judgment on plaintiffs'

federal copyright and trade dress claims.

## III.    APPLICABLE LAW

### A.    Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of

law."[20] An issue of fact is genuine "'if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.'"[21] A fact is material when it

"'might affect the outcome of the suit under the governing law.'"[22] "It is the

movant's burden to show that no genuine factual dispute exists."[23]

---

[20]    Fed. R. Civ. P. 56(c).

[21]    *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[22]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

[23]    *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it must do more than show that there is "'some metaphysical doubt as to the material facts,'"[24] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[25] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[26]

"Where the burden of proof at trial would fall on the non-moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non-movant's claim."[27] "In that event, the non-moving party must come forward with admissible evidence

---

[24]    *Higazy*, 505 F.3d at 169 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[25]    *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[26]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[27]    *Rodriguez v. City of New York*, No. 06 Civ. 9438, 2008 WL 525737, at *2 (S.D.N.Y. Feb. 27, 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 273 (2d Cir. 2001)).

9

sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."[28]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[29] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[30] Summary judgment is therefore inappropriate "'if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party.'"[31]

## B.     Copyright

"Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived,

---

[28]     *Id.*

[29]     *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

[30]     *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson*, 477 U.S. at 249.

[31]     *American Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (quoting *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002)).

reproduced, or otherwise communicated . . . ."[32]  To prevail on a claim of

copyright infringement under the Copyright Act of 1976,[33] a plaintiff must

establish "(1) ownership of a valid copyright, and (2) copying [by the defendant]

of constituent elements of the work that are original."[34]

The validity of a copyright depends upon its originality.[35]  The

Supreme Court has made clear that originality in this context "does not signify

novelty" and indeed, "a work may be original even though it closely resembles

other works so long as the similarity is fortuitous, not the result of copying."[36]

Rather, originality, as used in this context, "means only that the work was

independently created by the author (as opposed to copied from other works), and

that it possesses at least some minimal degree of creativity."[37]  This level of

creativity is "extremely low," with "the vast majority of works mak[ing] the grade

---

[32]      17 U.S.C. § 102(a).

[33]      *Id.* § 101 *et seq.*

[34]      *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

[35]      *See Yurman Design, Inc. v. PAJ, Inc. ("PAJ, Inc.")*, 262 F.3d 101, 109 (2d Cir. 2001) (citing *Feist*, 499 U.S. at 345-47; U.S. Const. art. I, § 8, cl. 8).

[36]      *Feist*, 499 U.S. at 345.

[37]      *Id.* (citation omitted).

11

quite easily" as long as they possess "some creative spark, no mater how crude, humble or obvious."[38]

In addition, "[c]opyright law may protect a combination of elements that are unoriginal in themselves."[39] This Court has previously observed that "in cases involving design, [] it is difficult to discern when a combination of unoriginal component parts is itself original so as to merit copyright protection."[40] In particular, jewelry designs, as derivative works "based upon one or more preexisting works," have presented courts with this difficulty.[41]

Where a plaintiff holds a certificate of copyright registration made before or within five years of the first publication of a work, the certificate constitutes prima facie evidence of the first element – *i.e.*, "the validity of the copyright and of the facts stated in the certificate."[42] Thus, the certificate of registration raises a rebuttable presumption that the work in question is

---

[38]     *Id.* (quotation marks omitted).

[39]     *PAJ, Inc.*, 262 F.3d at 109.

[40]     *Diamond Direct, LLC v. Star Diamond Group, Inc.*, 116 F. Supp. 2d 525, 529 (S.D.N.Y. 2000).

[41]     17 U.S.C. § 101. *See, e.g., Diamond Direct*, 116 F. Supp. 2d at 529 (noting that "courts have struggled over the question of originality of jewelry designs").

[42]     17 U.S.C. § 410(c).

copyrightable,[43] as well as original.[44] Although a copyright registration issued

more than five years after the first publication of a work is not entitled to the

statutory presumption of validity, a court may accord it such evidentiary weight as

it sees fit.[45]

A plaintiff's "proffer of its certificate of copyright registration thus

shifts to [the defendant] the burden of proving the invalidity of the copyright []

and there the burden rests, unless the presumptions are rebutted."[46] The

presumption of validity may be rebutted by "other evidence in the record [that]

casts doubt on the question."[47] This includes evidence that the work at issue has

been copied from the public domain, or that the work is a non-copyrightable

utilitarian article.[48]

---

[43]    *See M. Lady, LLC v. AJI, Inc.*, No. 06 Civ. 0194, 2007 WL 2728711, at *3 (S.D.N.Y. Sept. 19, 2007) (citing *Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997)).

[44]    *See Yurman Design, Inc. v. Golden Treasure Imps., Inc. ("Golden Treasure")*, 275 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) (citing *Boisson v. Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir. 2001)).

[45]    *See* 17 U.S.C. § 410(c).

[46]    *Fonar*, 105 F.3d at 104 (citation omitted).

[47]    *Id.* (citation omitted).

[48]    *See id.* (citations omitted).

13

## IV.  DISCUSSION

The parties have asked the Court to decide as a matter of law whether plaintiffs own a valid copyright in the Design.  In support of its motion, defendants primarily advance two arguments: *first*, that plaintiffs cannot claim copyright protection over an unoriginal, "trivial variant" of the 88th's Division clover insignia, which is a part of the public domain,[49] and *second*, that plaintiffs' certificate of copyright registration does not constitute prima facie evidence of their ownership of a valid copyright and should not be accorded any weight because it is false and inaccurate.[50]  Additionally, defendants claim that even if plaintiffs had a valid copyright, it "was dedicated to the public through its failure to place notice on copies from 1968 [through] 1989."[51]

Plaintiffs contend that they own a valid copyright where the Design meets the low threshold of creativity required by the Copyright Act and where it consists of an "original combination of several elements" even though the individual elements, standing alone, may be unoriginal or part of the public

---

[49]    Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def. Mem.") at 8, 10-12.

[50]    *See id.* at 9-10.

[51]    *Id.* at 13.

14

domain.[52]  Plaintiffs further argue that copyright ownership is determined by the

law of the country with the most significant relationship to the work at issue as

well as the parties – according to plaintiffs, France – and applying French law,

plaintiff Van Cleef & Arpels, Inc. owns the copyright in the Design.[53]

As an initial matter, plaintiffs do not rely on their certificate of

copyright registration, received by the Copyright Office in 1976, as prima facie

evidence of their ownership of a valid copyright.[54]  Instead, plaintiffs contend that

because the Design was originally created in France, by a French company –

SLERPA, and by French nationals, French copyright law applies to the question of

ownership.[55]  Applying French law, plaintiffs assert that the Design is subject to

copyright protection and plaintiffs own that copyright.[56]

---

[52]    Pl. Opp. at 14.

[53]    *See id.* at 15-19.

[54]    Indeed, plaintiffs concede that because the certificate of copyright
registration was issued more than five years after the Design's first publication,
they are not entitled to a statutory presumption of validity.  *See id.* at 15 n.7.

[55]    *See id.* at 15.

[56]    *See id.* (citing *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
153 F.3d 82 (2d Cir. 1998) ("Since the works at issue were created by Russian
nationals and first published in Russia, Russian law is the appropriate source of
law to determine issues of ownership of rights.").

15

Defendants counter by arguing that because plaintiffs sold their works

without notice from 1968 through 1989, and because there is no restoration of

copyright protection over such works when they are first published in the U.S.,

plaintiffs are now attempting to belatedly revise the location of first publication

from the U.S. to France.[57]  According to defendants, this attempt to revise

plaintiffs' copyright registration should be disregarded as a late effort to "save"

their copyright.[58]

Other than speculative assertions, defendants offer no evidence to

contradict what the Court finds to be the credible testimony of plaintiffs' witness.

Micheline Roussier, a former SLERPA employee, testified that she participated in

the creation of the Design on behalf of SLERPA in 1968,[59] and that she believes

the pieces bearing the Design were first sold in France prior to their availability

for sale in the United States.[60]  Defendants have not presented even a scintilla of

---

[57]    *See* Def. Reply at 7-8.

[58]    *Id.* at 8.

[59]    *See* 12/12/07 Deposition of Micheline Roussier ("Roussier Dep."),
Ex. M to Benschar Decl., at 25:10-13.

[60]    *See* Roussier Dep., Ex. F to Declaration of Kalpana Nagampalli
("Nagampalli Decl. II"), defendants' counsel, attached to Def. Reply, at 146:11-22
(Defendants' counsel:  "Tell me every reason you personally know that the
Alhambra was sold in France first before the United States?"  Roussier: "Because
as soon as the first three models were manufactured, they were presented to Mr.

evidence or indeed any reason why this testimony should not be credited.

Moreover, the Second Circuit has previously rejected the argument that a

copyright registration is invalidated or that a finding of ownership is precluded

because the registration was corrected after it was originally issued.[61]

In support of their claim that the Design is subject to copyright

protection under French law and that plaintiffs own that copyright, plaintiffs have

submitted the report of Professor Nicholas Binctin, who specializes in intellectual

property law at the University of Poitiers in France.  Through his report, Professor

Binctin testifies that the Design is protected by France's copyright law, and that,

initially, SLERPA, and now, plaintiffs own the copyright.[62]  Because plaintiffs

have submitted substantial evidence to support their claim of ownership and

because defendants have failed to raise an issue of material fact supported by any

---

Pierre Arpel who had them put in inventory straight away."  Defendants' counsel:
"Is it possible that pieces were sold in the United States first that were Alhambra
pieces?"  Roussier:  "I don't believe so, but I don't have absolute certainty.").

[61]    See Hamil Am., Inc. v. GFI, 193 F.2d 92, 98-99 (2d Cir. 1999)
(holding that revisions to copyright registration to correct identity of the work's
author did not invalidate the registration, and even if the plaintiff's "recordation
was initially inadequate, [the] alleged shortcoming [does] not justify dismissal of
its copyright action").

[62]    See Declaration and Expert Report of Professor Nicholas Binctin,
attached to Pl. Opp.

17

evidence in the record, summary judgment is granted to plaintiffs on the issue of ownership.

I turn next to defendants' argument regarding the preclusive effect of the 88th Division's clover insignia on plaintiffs' copyright claim. *First*, the Design and the 88th Division's clover are distinguishable. The 88th Division's clover insignia is a simple quatrefoil shape of equal height and width, most often appearing as a cloth patch worn on the sleeve of a uniform.[63] While defendants have submitted evidence that the 88th Division clover insignia may also take the form of "sweetheart jewelry" such as pins and pendants, those pieces are also distinguishable from the Design and do not possess the same combination of elements.[64] Most notably, those pieces lack the beaded metal frame, the corner prongs, and the dimensions of the clover shape itself are different from that of the Design.

*Second*, despite the incorporation of elements that defendants contend are in the public domain – such as the quatrefoil shape and a metal frame – the "originality" in the Design "inheres in the way" plaintiffs have "recast and

---

[63]    *See, e.g.*, Photograph of Solider in Uniform, Ex. B to Nagampalli Decl. II, at 4.

[64]    *See, e.g.*, Photograph of 88th Division Sweetheart Pendant and Pin, Ex. 8 to Declaration of Kalpana Nagampalli ("Nagampalli Decl. I"), attached to Def. Mem., at 1.

arranged those constituent elements."[65]  Indeed, the "plaintiffs do not dispute that their copyrighted jewelry designs are composed of common elements in the designs; rather the [] copyrights are for the design combinations that result from combining those common elements."[66]

> *Third*, there is nothing in the record to support defendants' contention that the copyright is not valid because the Design was copied from the public domain.  Defendants have provided photographs of, inter alia, the 88th Division's clover insignia in varied incarnations, edifices utilizing the clover shape in their architectural design, and possibly infringing jewelry pieces from other companies.  However, the clover shapes pictured in defendants' photographs are readily distinguishable from the Design, and they do not feature the combination of elements over which plaintiffs claim copyright protection.  Moreover, the fact that distinguishable clover shapes exist does not constitute evidence that plaintiffs' Design was copied from the public domain.  In the absence of any evidence linking the creation of plaintiffs' Design to the public domain, defendants' argument is untenable.[67]

---

[65]    *PAJ, Inc.*, 262 F.3d at 110.

[66]    *Golden Treasure*, 275 F. Supp. 2d at 515.

[67]    *See Boisson*, 273 F.3d at 270 (finding that defendants failed to show plaintiff copied her alphabet quilt design from the public domain where

19

Because defendants have not offered evidence to raise a disputed

issue as to a material fact and because the undisputed evidence supports plaintiffs'

version of the facts, I hold that plaintiffs own a valid copyright in the Design as a

matter of law.  As a result, I hold that the first element of plaintiffs' copyright

claim is satisfied.

## V.     CONCLUSION

For the reasons set forth above, I hold that plaintiffs own a valid

copyright in their Design, as a matter of law.  The Clerk of the Court is directed to

close the motions [Document Nos. 18, 23, 43].  Because plaintiffs have

represented to the Court that they have settled their claims against defendant The

Yellow Door, the Clerk of the Court is directed to alter the caption (07 Civ. 1445)

accordingly.  Additionally, for the reasons set forth at a telephone conference held

on April 16, 2008, plaintiffs are granted leave to re-file their motion for the

---

defendants' only evidence was plaintiff's deposition testimony that she had seen
alphabet designs in other quilts).

20

Court's decision as a matter of law on certain elements of their Lanham Act trade

dress claim.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             April 18, 2008

**- Appearances -**

**For Plaintiffs**:

Milton Springut, Esq.
Tal S. Benschar, Esq.
Kalow & Springut LLP
488 Madison Avenue
New York, NY 10022
(212) 813-1600
Fax: (212) 813-9600

**For Defendants**:

Kenneth S. Feldman, Esq.
Kalpana Nagampalli, Esq.
Feldman Law Group, P.C.
12 East 41st Street
New York, NY 10017
(212) 532-8585
Fax: (212) 532-8598

175547.1

Milton Springut, Esq. (MS6571)
Tal S. Benschar, Esq. (TSB0838)
KALOW & SPRINGUT LLP
488 Madison Avenue
New York, New York 10022
Tel: (212) 813-1600
Fax: (212) 813-9600

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
VAN CLEEF & ARPELS LOGISTICS, S.A. and    :
VAN CLEEF & ARPELS, INC,                                  :        Civil Action
                                                                                    :
                          Plaintiffs,                           :        No.
                                                                                    :
v.                                                                               :
                                                                                    :
VICCARIO FINE JEWELRY;                                    :
and JOHN DOES 1-10,                                         :
                                                                                    :
                                                                                    :
                          Defendants.                         :
------------------------------------------------------------x

## DECLARATION OF NICOLAS LUCHSINGER

   **NICOLAS LUCHSINGER** declares that:

     1.      I am employed by Van Cleef & Arpels, Inc. as the Director of its New York store located at 744 Fifth Avenue, New York, New York.

     2.      I have worked in my current position for the last two years.  Prior to that time, I worked for ten years at Christie's Auction House in the jewelry department, where I was involved in the appraisal and auction sales of all types of jewelry.

### Van Cleef & Arpels History And Corporation

     3.      Van Cleef and Arpels has its origins with the marriage of Estelle Arpels to Alfred Van Cleef in 1896.  For over 100 years, the family owned business has been famous throughout the world for its design and sale of fine jewelry pieces.

4.      Van Cleef and Arpels was taken over and reorganized by the Richemont Group in 2000.  Since then the company has steady growth in the United States and throughout the world.

5.      Currently there are ten Van Cleef & Arpels boutiques located in the United States: in Manhattan, Manhasset, New York, Chicago, Illinois, Chevy Chase, Maryland, Palm Beach, Florida, Boca Raton, Florida, Miami, Florida, Costa Mesa, California and Honolulu, Hawaii.

6.      In addition, Van Cleef and Arpels sells jewelry at wholesale to select jewelers in the United States, which are listed as follows:

> Boston, MA – Dorfman Jewelers
> Dallas, Texas – Neiman Marcus
> East Hampton, NY – London Jewelers
> Flushing, NY – Cosmos Jewelers
> Greenvale, NY – London Jewelers
> Greenwich, CT – Betteridge Jewelers
> Honolulu, HI – Neiman Marcus
> Kansas City, MO – Halls Jewelers
> Philadelphia, PA – Bernie Robbins Jewelers
> Pittsburgh, PA – Orr's Jewelers
> Sarasota, FL – Mayor's Jewelers
> Southampton, NY – London Jewelers
> Vail, CO – Betteridge Jewelers

7.      In each of these wholesale accounts, Van Cleef and Arpels maintains a corner section devoted exclusively to the sale of Van Cleef and Arpels products.  The counters and other décor of these corners are especially designed to match the Van Cleef and Arpels boutiques and present a unique image to the consumer.

8.      There are two plaintiffs in this case.  Van Cleef and Arpels, S.A. owns all trademark and trade dress rights for Van Cleef & Arpels worldwide.  Van Cleef & Arpels, Inc. is responsible for operation of the Van Cleef & Arpels boutiques in the United States and for maintenance of the wholesale accounts.  It is the exclusive U.S. licensees of all trademark and trade dress rights used in the Van Cleef & Arpels business in the United States.  In addition, Van Cleef & Arpels, Inc. is the owner of the copyright asserted in this case.

**The Alhambra Jewelry Line**

9.     Beginning in 1968, Van Cleef and Arpels has been marketing what is known as the Alhambra Jewelry Line, more recently named the Vintage Alhambra Jewelry Line.  The Vintage Alhambra line has a distinct look and appearance that separates it from other jewelry lines.  These distinctive elements were first used in the Alhambra line in necklaces.  The same design was then used in bracelets, earrings rings and more recently in a watch.  The following are pictures of several Vintage Alhambra pieces from the current line:



VINTAGE ALHAMBRA NECKLACE





VINTAGE ALHAMBRA BRACELET

VINTAGE ALHAMBRA SINGLE-
PENDANT NECKLACE





VINTAGE ALHAMBRA NECKLACE

VINTAGE ALHAMBRA RING



VINTAGE ALHAMBRA EARRINGS          VINTAGE ALHAMBRA WATCHES

10.    The in-laid translucent, semi-precious materials vary in color and include white mother-of-pearl, onyx, carnelian, chalcedony, turquoise, and tiger-eye.

**Sales of Alhambra Jewelry**

11.    The Vintage Alhambra line has been a popular seller for Van Cleef & Arpels (hereinafter "VCA") in the United States.  In the early 1980s, the Alhambra experienced a great wave of popularity.  Since 2001, VCA has sold in the United States in excess of Twenty-Five Thousand (25,000) pieces of Vintage Alhambra alone, for more than Sixty Million Dollars ($60,000, 000).  These jewelry items sell for an average of  $2,000 each and some are sold for upwards of $60,000.

**Advertising And Promotion of Alhambra**

12.     The Vintage Alhambra Jewelry Line has been extensively promoted by VCA in the United States.

13.    Each year, VCA publishes tens of thousands of catalogs, which are distributed to its customer mailing list by mail, as well as through its boutiques.  The catalogs since at least 2001 all prominently feature the Alhambra line.

5

14.    VCA also engages in extensive advertising of the its jewelry lines, including the Alhambra line, primarily through the print media.  The Alhambra line has been featured in such publications as *The New York Times, The Wall Street Journal, Vanity Fair, Architectural Digest, Robb Report* and others.

15.    The Alhambra line is promoted by VCA's Public Relations Department in two other ways.  First, it actively encourages what is known as "editorial placements" in fashion magazines and similar publications.  Such publications may wish to do a fashion shoot for their cover or for an article on a particular fashion trend (*e.g.,* the color black will be fashionable next season).  The publication will then borrow a jewelry item from Van Cleef and Arpels to be photographed as part of the article or cover, and the publication will then identify the item as Van Cleef & Arpels, often with along with a price.  In this way, the item will receive additional exposure in fashion magazines among those likely to want to purchase such items.

16.    Second, the Public Relations Department has close relations with publicists of a large number of celebrities.  Van Cleef & Arpels pieces are often loaned to these celebrities, through their publicists, to wear at various events (*e.g.,* charity or awards events).  In this way, the items are exposed to the media and associated with the glamour and fame of the celebrity.

**Media Comments**

17.    The Alhambra Line has also been widely noted and commented upon by the media, both the fashion press and the general media.  The number of such comments collected by VCA are too voluminous to attach.  As a sample, I attach, as Luchsinger Declaration Exhibit A, an article from the New York Times dated October 21, 2007.

18.     In sum, after nearly forty years of promotion and sale, the Alhambra line, and in particular the Vintage Alhambra, has become widely known and admired among the high-end luxury purchasers of jewelry.  As the *New York Times* commented, "Alhambra clovers have silently stolen around the necks of women across the planet, becoming an iconic symbol of wealth and inclusion . . ."

19.     I am making a Vintage Alhambra item available for review by counsel and the Court.  It will be marked as Luchsinger Declaration Exhibit B.

20.     I have reviewed pictures of a sample item purchased from Defendant Viccario Fine Jewelry.  The sample item is a very close copy of a Vintage Alhambra item, and would no doubt be easily confused with the genuine product by many consumers.

21.     I declare under penalty of perjury that the forgoing is true and correct.


Dated: June 3 , 2008                          By: _____
New York, New York                                        Nicolas Luchsinger

# LUCHSINGER DECLARATION

# EXHIBIT A



My Account | Welcome, mspring | Log Out | Help

**The New York Times**

# T Magazine

E*TRADE

&bull; Style  ○ All NYT  [Search]

OBSESSIONS

## Coming Up Clover

By ALEX KUCZYNSKI
Published: October 21, 2007

E-MAIL
PRINT
SAVE
SHARE

ARTICLE TOOLS
SPONSORED BY

THE DARJEELING LIMITED

During Fashion Week in September, the jeweler Van Cleef & Arpels hosted a party for customers, celebrities and the press at the Hammerstein Ballroom. Demi Moore, Ashley Olsen and Mischa Barton were part of the audience that made its way past a series of living tableaus in which models posed mute and stone-faced in the company's jewels. I accompanied Deirdre Murphy Bader, a former Olympic cyclist and Van Cleef customer, and her husband, Larry Bader, a lawyer and Van Cleef bill payer.

Next Article in Style (5 of 5) »

Sophisticated Shopper Deals by E-Mail

Sign up for shopping deals from NYTimes.com's premier advertisers. See Sample
ms@creativity-law.com [Sign Up]
Change E-mail Address | Privacy Policy



RALPH LAUREN



Illustration by Jo Ratcliffe

Inside, past the maze of mannequins, Lido dancers, flown in from Paris for the occasion, can-canned across the stage, diamond collars around their throats, their breasts held nakedly aloft in glittering, cupless brassieres. "Would you look at that jewelry?" Mr. Bader said, averting his eyes. The audience sat mesmerized at cabaret tables while waitresses passed canapés on linen napkins and a pair of models strode the runway, each carrying a sparkling leash attached to a poodle, one white, the other dyed a deep plush pink.

For all the variety the evening offered in terms of entertainment, one thing remained consistent: the vast number of women wearing necklaces, bracelets and rings from Van Cleef's Alhambra line. Alhambra, with its clover-shaped charms, was introduced in the late '60s but slumbered for decades. Then, with the addition of some new pieces in 2001, celebrities like Reese Witherspoon and Sharon Stone rediscovered the line. Now Alhambra clovers have silently stolen around the necks of women across the planet, becoming an iconic symbol of wealth and inclusion on a par with the Birkin bag or, in an earlier decade, the Bulgari coin necklace.

The classic line retails from about $1,200 for a pair of earrings to $61,200 for a necklace of diamond clovers, weighing in at 10.5 carats total. Each clover, modeled after the quatrefoil in Moorish architecture, is often referred to as a "station," which to a Catholic ominously evokes the stations of the cross but somehow seems appropriate, given the ardor with which Alhambra is collected. Mrs. Bader, for example, has acquired a pink opal necklace, turquoise earrings, a turquoise necklace, a long mother-of-pearl necklace, mother-of-pearl earrings and a mother-of-pearl watch.

Alvina Patel, the publicity director for Van Cleef in New York, invited me to the boutique on 57th Street to sift through the velvet drawers. I asked her about market saturation: when is it too much? "There will be ebbs and flows in the market," Patel said. "Right now we're on an up cycle, and we can't keep the stuff in the store." The company apparently has plans for world domination, having recently introduced Magic Alhambra, combining large and small clovers; Lucky Alhambra, combining heart, leaf and butterfly shapes with the clovers; and Sweet Alhambra, a line for children and their mothers, starting at around $800. Laura Linney wore Alhambra earrings as the uptight Upper East Side Mrs. X in "The Nanny Diaries."

Knockoffs are rampant. A New York socialite I know had her Alhambra necklace made on

MOST POPULAR

E-MAILED | BLOGGED | SEARCHED

1. The Future Is Drying Up
2. Frank Rich: Suicide Is Not Painless
3. Fearing Crime, Japanese Wear the Hiding Place
4. Thomas L. Friedman: Save the Planet: Vote Smart
5. A Counter History
6. Everybody's Business: The Gloomsayers Should Look Up
7. Backcountry Belize
8. Tighter Border Delays Re-entry by U.S. Citizens
9. Indian-American Elected Louisiana's Governor
10. Journeys | Paris: Finding Liberté on Two Wheels

Go to Complete List »



47th Street for a quarter of the retail price. Heidi Klum appropriated the clover design for
the jewelry she designs for Mouawad, and Web sites such as Overstockjeweler.com offer
copies for $180. Van Cleef has filed more than 10 lawsuits in the past year alone.

Marion Fasel, a jewelry editor for InStyle magazine, said the popularity of Alhambra is
unique in its universality. "I see it on celebrities, and I see it on the street, and I see it on
the subway, and I don't know if it's real or fake, but I am just amazed at how much I see
it," she said.

And thus the question is begged. If everyone is wearing something, why would anyone
want to buy it? Even Patel of Van Cleef acknowledged that retail ubiquity is the kiss of
death. "I know that when I see a handbag being knocked off on the street, I stop carrying
it," she told me. I asked Richard Conniff, the author of "The Natural History of the Rich: A
Field Guide," why everyone would want to wear the same thing. "It is basically a badge of
admission," Conniff said. "People conform to show that they are part of a group. But then
they utterly hate you if you shatter the illusion of individuality by pointing out their
conformity." Oops.

Nevertheless, when I wrapped the 16 stations of the long gold necklace (retail price:
$12,900) around my neck at London Jewelers in Southampton, where you can't walk
down Main Street without seeing a woman in an Alhambra necklace, I couldn't help but
admire its beauty, its heft, its invocation of both the exotic (my mind flashed on Peter
O'Toole in "Lawrence of Arabia") and the utterly wholesome (Reese Witherspoon). But I
wasn't prepared to go all the way yet. I went home, logged on to Overstockjeweler.com and
bought a "Van Cleef & Arpel [sic] Inspired Yellow Gold Plated Mother of Pearl Alhambra
Multi Charm Bracelet" for $54.99 instead.

Next Article in Style (5 of 5) »

Need to know more? 50% off home delivery of The Times.

**Tips**
To find reference information about the words used in this article, double-click on any word, phrase or name. A
new window will open with a dictionary definition or encyclopedia entry.

**Past Coverage**
FORAGING; Amman, Jordan: Lama Hourani Jewelry (October 14, 2007)
Cash to Get By Is Still Pawnshop's Stock in Trade (September 14, 2007)
SQUARE FEET; Jewelers Are Drawn to an Already Gilded Avenue (September 12, 2007)
THE REMIX; Blog Is the New Black (August 26, 2007)

**Related Searches**
Jewels and Jewelry

**INSIDE NYTIMES.COM**



**TRAVEL**
nytimes.com/travel

**The communal bike craze in Paris**
Also in Travel:
Where Rodeo Drive meets Newbury Street
A European guide for the fall
Politics at play on Martha's Vineyard

ADVERTISEMENTS

All the news that's fit to personalize.

**Small Business Toolkit** GO »

The New York Times STORE



Eleanor Roosevelt - 1934
Buy Now

Ads by Google                what's this?

**UrbanTown.com - Shoes**
New exciting destination for shoes Largest
selection - designer brands
www.urbantown.com/accessories/shoes

ARTS »        OPINION »        THE CITY »        OPINION »        MAGAZINE »        FASHION & STYLE »

          

**Why Fans Don't Like J.D. Drew**
He's too glum, writes Will Leitch.

When It Takes Three People to Make a Duet

Frank Rich: Suicide Is Not Painless

The United Nations of Brooklyn

Will There Be Room Again for Jewish Delis?

Washington Feels Hollywood's Heat

Home | World | U.S. | N.Y. / Region | Business | Technology | Science | Health | Sports | Opinion | Arts | Style | Travel | Jobs | Real Estate | Automobiles | Back to Top

Copyright 2007 The New York Times Company | Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

VCA0451